CERTIFIED LABORATORIES OF TEX-
AS, INC., National Chemsearch Corpo-
ration of New York, Inc., and Dyna Sys-
tems, Inc.

v.

Alan RUBINSON, Robert W. Lowery, Jay
Griffith, Herb Kress and Malter
International Corp.

Civ. A. No. 69–1009.

United States District Court
E. D. Pennsylvania.

Sept. 10, 1969.

As Amended Oct. 28, 1969.

Schnader, Harrison, Segal & Lewis, Bancroft D. Haviland, Dennis R. Suplee, Philadelphia, Pa., for plaintiffs.

Seymour Kurland, Bernard Chanin, Philadelphia, Pa., for defendants; Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., of counsel.

## OPINION

JOSEPH S. LORD, III, District Judge.

This action is brought by three corporations engaged in selling products known as chemical specialties against four former salesmen for breach of various covenants ancillary to their employment and for misuse of trade secrets; against these same defendants and a corporate competitor for inducing

the breach of these covenants; and against all defendants for conspiracy to commit the aforementioned contractual breaches and torts. Plaintiffs seek equitable relief as well as money damages.

Jurisdiction is based upon diversity of citizenship and the requisite jurisdictional amount. 28 U.S.C. § 1332.

## I. FINDINGS OF FACT

1. Plaintiffs, Certified Laboratories of Texas, Inc. ("Certified"), National Chemsearch Corporation of New York, Inc. ("Chemsearch"), and Dyna Systems, Inc. ("Dyna Systems"), are affiliated Texas corporations with their principal places of business in Dallas, Texas.

2. The individual defendants, Alan Rubinson ("Rubinson"), Robert W. Lowery ("Lowery"), Jay Griffith ("Griffith"), and Herb Kress ("Kress") reside in and are citizens of the Commonwealth of Pennsylvania.

3. The corporate defendant, Malter International Corp. ("Malter"), is a Louisiana corporation with its principal place of business in Gretna, Louisiana.

4. The amount in controversy against each defendant exceeds $10,000 exclusive of interest and costs.

5. For many years plaintiffs Certified and Chemsearch and their predecessors have been engaged in the business of selling and distributing disinfectants, soaps, detergents, cleaners, chemical specialties, insecticides, paints, water treatments, maintenance chemicals, adhesives, glues, paper products for industry and institutions, degreasers, sanitary supply and floor maintenance materials and equipment and related products in Pennsylvania and throughout the United States.

6. Plaintiff Dyna Systems is engaged in the business of selling and distributing a number of the kinds of products described in the immediately preceding paragraph as well as fasteners, lubricants, engine additives, electric terminals, connectors, and washing, degreasing, lubricating and chemical application equipment in Pennsylvania and throughout the United States.

7. Plaintiffs Certified, Chemsearch and Dyna Systems and defendant Malter are engaged in what is known as the chemical specialties, maintenance, chemical and sanitary supply business. The products which they merchandise perform generally similar functions and are competitive.

8. The chemical specialties industry is a highly competitive business in which basically identical maintenance and sanitation preparations are marketed through aggressive, door-to-door sales programs to bulk consumers, principally commercial, industrial and institutional users.

9. The marketing technique employed by plaintiffs and defendant Malter, and generally employed by their competitors, is to engage a large sales force in the field, canvassing aggressively and distributing novelty gifts to secure entry to the customer and to stimulate repeat business.

10. Plaintiffs have invested in and have developed programs of recruiting and training salesmen, including aptitude tests, interviews, study, training guides and materials, training in the field, periodic reports to sales managers and analyses of such salesmen's work, product guides, demonstration kits and training in connection therewith, as well as periodic sales and training meetings, and periodic issuance of new training material.

11. The individual defendants made application for employment with the plaintiffs and were hired by plaintiffs at the following times:

| | | |
|---|---|---|
| Rubinson | Certified | 12/3/64 |
| Lowery | Certified | 5/17/67 |
| Griffith | Chemsearch | 6/28/68 |
| | Dyna Systems | 1/28/69 |
| Kress | Chemsearch | 2/8/65 |
| | Dyna Systems | 1/28/69 |

12. Before or during each such hiring, each individual defendant executed

a written agreement of employment containing covenants not to compete and not to disclose confidential information.

13. The individual defendants received no commissions, customer lists or other confidential information before the execution of their respective agreements of employment. Thereafter, they received information concerning identity of and buying habits of customers included in customer lists; they also received commission lists, sales guides, product information, presentation books and other confidential documents from plaintiffs; they began work in their respective assigned territories; and they received regular draws, commissions and became regular employes.

14. The customer lists received by each defendant from plaintiffs contained, in addition to the names and addresses of customers, the dates of prior sales, the amount bought and the product bought and, in many instances, the name of the person responsible ·for buying these items. These lists and the information contained therein were confidential and of aid in selling in the area and to these customers.

15. At the time of their employment by plaintiffs Certified and Chemsearch, the individual defendants had no prior experience in selling chemical specialty items or any similar items and had never made sales to chemical specialty customers in the respective territories assigned to them by plaintiffs.

16. The counties assigned as territories to the individual defendants and two former defendants Charles T. Barr and John Slawek [1] under their contracts with the respective plaintiffs or amendments thereto were as follows:

| Name | Chemsearch | Certified | Dyna Systems |
| --- | --- | --- | --- |
| Rubinson | | Philadelphia Bucks Lehigh Northampton | |
| Kress | Northampton Monroe | | Monroe Northampton Bucks Warren, N. J. |
| Griffith | Lehigh Carbon | | Lackawanna Lehigh Carbon |
| Lowery Slawek Barr | | Chester Delaware Philadelphia | |

17. The agreements of employment between plaintiffs and each of the individual defendants and also quondam defendants Barr and Slawek provided in pertinent part:

"4. Representative expressly covenants and agrees that during ·the term of his employment by Company and for a period of eighteen (18) months immediately following the expiration or termination of such employment for any reason including, without limitation, termination by mutual agreement, (i) he will not at any time for himself or on behalf of any other person(s), firm(s), partner-

[1]. Motions for directed verdicts were granted in favor of Barr and Slawek.

ship(s), or corporation(s), sell, offer for sale, or solicit the sale of disinfectants, soaps, detergents, cleaners, chemical specialties, paints, water treatments, maintenance chemicals, insecticides, adhesives, glues, paper products for industry and institutions, degreasing and sanitary supply and floor maintenance materials and equipment within the assigned territory, viz:

\* \* \* \* \* \*

"B. Any territory(ies) which is hereafter assigned to Representative by written contractual change or designation;

"C. Any territory(ies) not presently assigned to Representative, but which was assigned as part of his territory under any prior contract of employment with Company or one or more of its affiliated and associated companies;

"D. Any territory(ies) to which Representative is transferred by mutual consent of the parties whether or not such agreement is evidenced in writing;

"E. Any territory(ies) which Company in the exercise of its discretion may assign to Representative, whether or not such assignment is evidenced in writing;

"F. Any territory(ies) in which Representative sells, offers for sale, or solicits the sale of disinfectants, soaps, detergents, cleaners, chemical specialties, paints, water treatments, maintenance chemicals, insecticides, adhesives, glues, paper products for industry and institutions, degreasing and sanitary supply and floor maintenance materials and equipment for Company or one or more of its affiliated and associated companies;

(ii) he will not in any way, directly or indirectly, for himself or on behalf of or in conjunction with any other person(s), partnership(s), firm(s) or corporation(s), solicit, divert, take away or attempt to take away any of the Company's customers or the business or patronage of any such customers located within said assigned territory; and (iii) he will not in any way, directly or indirectly, for himself or on behalf of or in conjunction with any person(s), partnership(s), firm(s), or corporation(s), solicit, entice, hire, employ or endeavor to employ any of the Company's employees. Representative further covenants and agrees that he will not within said period of time, directly or indirectly, engage in or enter the employment of or act as a sales agent or broker for the products of or as an advisor or consultant to any person(s), firm(s), partnership(s) or corporation(s) engaged in or about to become engaged in the manufacture, distribution or sale of disinfectants, soaps, detergents, cleaners, insecticides, chemical specialties, paints, water treatments, maintenance chemicals, adhesives, glues, paper products for industry and institutions, degreasing and sanitary supply floor maintenance materials and equipment within the assigned territory. In the event of violation by Representative of any one or more of the covenants contained in this paragraph, it is agreed that the terms of each such covenant so violated shall be automatically extended to a period of eighteen (18) months from the date on which Representative permanently ceases such violation or for a period of eighteen (18) months from the date of the entry by a court of competent jurisdiction of a final order or judgment enforcing such covenant(s), whichever period is later."

18. The agreements between Certified and Barr, Certified and Slawek, Chemsearch and Griffith, Dyna Systems and Griffith and Dyna Systems and Kress also contained the following additional geographic restriction on the proscribed activities:

"F. For a distance of forty-five (45) miles beyond the assigned territory or other territory(ies) above described; \* \* \*"

19. The employment contracts here were terminable at will. While no territory was exclusive, either between the salesmen of a single company or as between those of the several companies, the defendants did enjoy a system of "protected accounts." Under this system a salesman was entitled to a commission on any sales made to an account which he had sold within the previous six-month period.

20. Such restrictive covenants are customary in the chemical specialties, maintenance chemicals and sanitary supply industry and corporate defendant Malter utilizes a virtually identical covenant with each of its salesmen.

21. The following restrictions serve the legitimate business interests of the covenantees and do not impose an undue hardship upon the covenantors:

1) The agreement not to solicite or divert, directly or indirectly, the covenantee's trade within the assigned territory;

2) the agreement not to solicit, hire or attempt to hire the covenantee's employes;

3) the agreement not to divulge confidential information during the course of employment and after termination; and

4) the agreement not to solicit and sell customers in the assigned territory and the territories in which the covenantor operated during his employ, only to the extent that it prohibits the solicitation of accounts sold by salesmen of the company or called upon by the covenantor within such territory.

22. The following restrictions do not serve the legitimate business interests of the covenantees and impose an undue hardship upon the covenantors:

1) The blanket territorial restriction, except to the extent mentioned above in Finding of Fact 21(4);

2) the agreement not to enter the employ of, act as sales agent or broker for, or consultant to, companies selling maintenance chemicals in the assigned territory; and

3) the blanket agreement not to sell or solicit customers within 45 miles of the assigned territory.

23. During their employment with plaintiffs, the individual defendants solicited and made sales to plaintiffs' customers in the territories to which they were assigned by their agreement and received commissions from plaintiffs therefor. During the year 1968, the individual defendants made the following net sales for plaintiffs and received the following compensation from plaintiffs by virtue of employment:

| | Kress | Griffith | Rubinson | Lowery |
|---|---|---|---|---|
| 1968 Net Billing | $54,985 | $11,452 | $65,028 | $73,881 |
| Compensation | 17,566 | 3,342 | 18,472 | 17,441 |

24. During their employment with plaintiffs, the individual defendants were plaintiffs' principal, and their sole direct contact with plaintiffs' customers in defendants' assigned sales territories and the individual defendants became familiar with the customers' specific problems, buying habits, needs and requirements.

25. The individual defendants and former defendants Barr and Slawek voluntarily terminated their employment with plaintiffs on or about the dates set

forth in Column 3 below, and on or before the dates set forth in Column 4 below were employed by defendant Malter in the following capacities and under written contracts providing for the following assigned areas:

| | | | | |
|---|---|---|---|---|
| Rubinson | Certified | 2/19/69 | 2/19/69 | Sales Manager, Penna.; Delaware; Southern N. J. |
| Griffith | Chemsearch | 11/4/68 | | Salesman, Monroe Co.; Lackawanna Co. |
| | Dyna Systems | 3/17/69 | 3/17/69 | |
| Kress | Chemsearch | 12/31/68 | | Salesman, Berks Co. |
| | Dyna Systems | 3/17/69 | 3/17/69 | |
| Lowery | Certified | 4/19/69 | 4/19/69 | Asst. Sales Manager and Trainer, Penna. Phila. Co. Salesman |
| Barr | Certified | 5/26/69 | 5/26/69 | Salesman, Delaware Co. |
| Slawek | Certified | 5/26/69 | 5/26/69 | Salesman, Chester Co. |

—————◆—————

26. Commencing before February 19, 1969, and continuing thereafter until the hearing in this action, defendant Rubinson, in violation of his contract with plaintiff Certified:

(a) Occupied the position of sales manager, advisor and consultant for defendant Malter in the State of Pennsylvania, including his former assigned territory for plaintiff Certified and in such capacity supervised and managed all of Malter's activities in Pennsylvania, Southern New Jersey and Delaware and was employed and authorized to act for Malter and did act for Malter in such area;

(b) solicited employes of plaintiffs, including the other individual defendants, to leave plaintiffs and become employes of defendant Malter;

(c) made sales and solicited sales for defendant Malter in his former assigned territory for plaintiff Certified and to customers of Certified which he had served for Certified;

(d) aided and assisted the individual defendants Kress, Lowery and Griffith in making sales and soliciting sales for Malter in his former assigned territory for Certified; and

(e) furnished defendant Malter and its employes with confidential information and documents of defendant Certified, including customer information and commission lists.

27. Commencing at or before the date of his resignation from plaintiffs' employ, and continuing thereafter, individual defendant Lowery, in violation of his contract with plaintiff Certified:

(a) Occupied the position of Assistant Sales Manager and trainer for defendant Malter in the State of Pennsylvania, including his former assigned territory;

(b) solicited employes of plaintiffs, including former defendants Slawek and Barr to leave plaintiffs' employ and become employes of defendant Malter;

(c) made sales and solicited sales for defendant Malter in his former assigned Certified territory and to customers he had served for Certified;

(d) diverted, took away and attempted to take away from Certified for the benefit of Malter plaintiffs' customers and patronage of customers which he had

previously served for Certified and which customers were in the territory formerly assigned him by Certified; and

(e) aided and assisted Slawek in making sales and soliciting sales for Malter in Lowery's former assigned territory for Certified and to customers which he had served for Certified.

28. Commencing at or before March 17, 1969, and continuing thereafter, defendants Kress and Griffith, in violation of their contracts with both plaintiffs Chemsearch and Dyna Systems:

(a) Solicited employes of plaintiffs, including the other individual defendants other than defendant Rubinson, to leave plaintiffs' employ and become employes of defendant Malter;

(b) made sales and solicited sales for defendant Malter in their former assigned territories for plaintiffs Chemsearch and Dyna Systems and to customers which they had previously served for Chemsearch and Dyna Systems;

(c) aided and assisted each other and defendant Rubinson in making sales and soliciting sales for Malter in their respective former assigned territories for Chemsearch and Dyna Systems and to customers which they had previously served for Chemsearch and Dyna Systems;

(d) took away and attempted to take away from Certified for the benefit of Malter plaintiffs' customers and patronage of those customers they had previously served for Chemsearch and which customers were in the territory formerly assigned them by Chemsearch;

(e) furnished defendant Malter and its employes with confidential customer information of plaintiffs Chemsearch and Dyna Systems.

29. All sales and solicitations by defendants Lowery, Kress, Griffith, and former defendants Barr and Slawek for defendant Malter were within 45 miles of their assigned territories for plaintiffs.

30. The aforesaid acts of the individual defendants were done with the full knowledge and participation of defendant Malter, and Malter, with full knowledge of the contractual obligations of the individual defendants, induced the aforesaid breaches thereof and participated in and profited from said violations.

31. Defendants Malter and Rubinson endeavored to conceal the aforesaid violation by:

(a) Inserting designations of territory in individual defendants' contracts, which areas, in fact, did not accurately represent the areas which the individual defendants were serving for Malter;

(b) destroying, altering and mutilating daily report sheets after they had been subpoenaed for depositions of defendants to hide the actions of the individual defendants in violation of their contracts with plaintiffs; and

(c) altering Rubinson's appointment book after the issuance of a subpoena and following a request by plaintiffs' counsel that the book be surrendered for inspection in order to hide the actions of the individual defendants in violation of their contracts with plaintiffs.

32. Defendants Malter, Rubinson, Kress and Griffith engaged in switching territories and customer information and endeavored to hide and conceal the exchange of customer information and sales assistance between and among them.

33. Defendant Malter and the individual defendants competed unfairly with plaintiffs in the following respects:

(a) By participation in and inducing the aforesaid breaches of the contracts of the individual defendants with plaintiffs;

(b) by soliciting and employing defendants' personnel with the intent of appropriating customer lists, customer information, trade secrets, commission lists and other confidential information in the possession of the individual defendants;

(c) by unfairly appropriating customer lists, customer information, commission lists and other confidential informa-

tion of plaintiffs for the use of defendant Malter; and

(d) by unfair or improper means diverting the customers and patronage of plaintiffs.

34. Defendants Malter, Rubinson, Kress, Griffith and Lowery agreed and conspired together:

(a) To violate the agreements of plaintiffs with the individual defendants;

(b) to induce the breach of the agreements of plaintiffs with the individual defendants;

(c) to compete unfairly with plaintiffs as aforesaid;

(d) to divert improperly to defendant Malter the customers and customer information of plaintiffs.

## II. DISCUSSION

### A. THE COVENANTS

#### 1. *Choice of Law*

The employment contracts upon which this lawsuit is based state that they are to be governed by the laws of the State of Texas. For example, paragraph 11 of the Sales Representative's Agreement between Certified and Rubinson, reads as follows:

> "Regardless of the place of execution or the order in which the signatures of the parties shall be affixed thereto or the place of performance, this agreement shall be interpreted in accordance with the laws of the STATE OF TEXAS."

The parties have not seen fit, however, to favor the court with any Texas cases, either on Texas' substantive law of restrictive covenants nor on Texas' choice of law rules, (assuming the agreement adverted to the entire body of Texas law, including its conflicts law.)[2]

Two reasons impel us, however, not to detain ourself with an investigation of Texas' law. First, notwithstanding the notion that equity follows the law, this adjudication requires an effort to harmonize the plaintiffs' contractual rights with the common law policy of economic liberty, see Spring Steels, Inc. v. Molloy, 400 Pa. 354, 162 A.2d 370 (1960). We may therefore enforce covenants to be performed within the Commonwealth only to the extent that they do not offend Pennsylvania's policy. Secondly, in view of the fact that the parties have given us no reason to believe that Texas' law differ from that of Pennsylvania[3] and since they have relied solely upon Pennsylvania law, we find that they made an effective choice of law for the purpose of this litigation.

#### 2. *Reasonableness*

In Pennsylvania the law of covenants not to compete ancillary to employment agreements has been reduced to cant. We learn that such covenants are restraints upon trade and as such are not viewed with favor; that they are subject to a more stringent test than those ancillary to the sale of a business; and that they are *prima facie* enforceable if "reasonably limited in duration of time and geographical extent." Morgan's Home Equipment Corp. v. Martucci, 390 Pa. 618, 628, 136 A.2d 838, 844 (1957). *Accord*, Jacobson & Company, Inc. v. National Environment Corp., 427 Pa. 439, 235 A.2d 612 (1967); Capital Bakers, Inc. v. Townsend, 426 Pa. 188, 231 A.2d 292 (1967); Barb-Lee Mobile Frame Co. v. Hoot, 416 Pa. 222, 206 A.2d 59 (1965). "General covenants are reasonably limited if they are 'within such territory and during such time as may be reasonably necessary for the protection of the employer * * * without imposing undue

---

2. It is entirely possible that, in order to interpret this agreement "in accordance with the laws of the STATE OF TEXAS," we would employ Texas' choice of law rules. An enlightened choice of law rule would refer to Pennsylvania law on the present facts because Pennsylvania is the jurisdiction most concerned with the validity and performance of restrictive covenants governing employment relations with its borders.

3. See National Chemsearch Corporation of New York, Inc. v. Bogatin, 233 F.Supp. 802 (E.D.Pa.1964).

hardship on the employee \* \* \* '. Restatement Contracts, § 516(f) (1932)." Morgan's Home Equipment Corp. v. Martucci, *supra*, 390 Pa. at 628, 136 A.2d at 844. The burden of proving that a covenant is not reasonably necessary for the protection of legitimate business interests and an undue hardship upon the employe is upon the covenantor. Jacobson & Company, Inc. v. National Environment Corp., *supra*, 427 Pa. at 451, 235 A.2d 612.

The defendants assert that "the cases establish that the crucial factor is the presence of some competitive advantage obtained as the result of the initial employment." Defendants' Trial Brief, 5. What defendants apparently mean by this is that restrictive covenants are enforceable only where the employe himself becomes the instrument of his employer's advantage over his competitors, but that such covenants will not be enforced to insulate the employer from the employe's use of the knowledge and skills common to the trade.[4] As we read the cases, the law is not so unfavorable to such restrictive covenants. For example, although the leading case of *Morgan's* seemed to deny relief because of the lack of "any special training or insight into methods of doing business of the plaintiff," Morgan's Home Equipment Corp. v. Martucci, supra, 390 Pa. at 632, 136 A.2d at 846, later cases make it plain that the imparting of specialized training and skills, and presumably "insights," is not a prerequisite for the enforcement of such covenants. Hayes v. Altman, 424 Pa. 23, 225 A.2d 670 (1967); Jacobson & Company, Inc. v. National Environment Corp., *supra*. In candor the post-*Morgan's* cases really do not differentiate the actual variables which support restrictive covenants *vel non*.

What we have derived from the statements of general principles found in the cases is really the Restatement formulation. And in view of the fact that here the assigned territories cover at most

several counties and that the duration of eighteen months is not great, our basic inquiry is whether the restrictions here are supported by a legitimate business interest of the plaintiffs.

The covenants to which the individual defendants subjected themselves include the following, the first four for eighteen months and the fifth presumably in perpetuity:

(a) A blanket prohibition against selling and solicitation of customers in assigned territories and territories in which the employe operated during his employ, ¶ 4(i);

(b) an agreement not to solicit or divert, directly or indirectly, the covenantee's trade within the assigned territory, § 4(ii);

(c) an agreement not to solicit, hire, or attempt to hire the covenantee's employees, directly or indirectly, ¶ 4(iii);

(d) an agreement not to enter into the employ of, act as sales agent or broker for, or consultant to, companies selling maintenance chemicals in the assigned territory, ¶ 4(iii); and

(e) an agreement to divulge confidential information during the course of employment and after termination, ¶ 6. In addition, defendants Kress and Griffith agreed to a geographical limitation of 45 miles beyond the assigned territories.

The reason assigned by the plaintiffs for the blanket territorial restrictions is that the companies wished to protect not only the former accounts of their former salesmen, but also the accounts of other salesmen in the assigned territory about which the salesman who terminated might have learned during his employ. There was also testimony that the companies desired to protect accounts in the making, presumably those which the covenantor had called upon. To be sure, these are legitimate business interests and worthy of protection. Whether a blanket territorial restriction

---

4. Defendants confuse the law of restrictive covenants with that of "trade secrets." See Capital Bakers, Inc. v. Townsend, *supra*, 426 Pa. at 192, 231 A.2d 292.

is necessary, however, is another matter. The restriction against the solicitation of former accounts in the assigned territories contained in paragraph 4(ii) of the standard contract goes far in protecting the companies' trade. This restriction protects also the accounts of fellow salesmen in the assigned territory.

The covenant purports to bar an ex-salesman completely from his former territory for a period of eighteen months. So read, it would prevent him from soliciting even brand-new prospects never before called on by him or by his fellow salesmen. Such a covenant, we think, is not supported by any legitimate business interest. What was said in *Morgan's* applies here:

> "The record in the present case discloses no evidence that the employes received any special training or insight into methods of doing business of the plaintiff company which would make it inequitable to have them compete with the plaintiff for the patronage of the public at large. Although the defendants obtained confidential customer information, *Morgan* was adequately protected by the decree which enjoined disclosure and solicitation, and so prevented the former employes from benefiting from their customer contacts and knowledge. Consequently, under these facts we find that the general covenants not to compete are not reasonably necessary for the protection of *Morgan* and constitute undue hardship upon its former employes. * * *"

Morgan's Home Equipment Corp. v. Martucci, *supra*, 390 Pa. at 632–633, 136 A.2d at 846. For the same reasons, the 45-mile "bulge" must also fall.

Plaintiffs do, however, have a legitimate business interest in protecting accounts within a salesman's territory which he had called on but had not theretofore sold. To this extent, the territorial restriction is valid.

We cannot agree with defendants that in the business of door-to-door selling of maintenance chemicals there is no goodwill to be protected, no confidential information to be exploited, and no allegiance to company or salesman. The conduct of the defendants convinces us of the contrary. Notwithstanding their protestations to the effect that the number of potential customers in a given county was virtually limitless, they evinced an uncommon interest in the trade of their former employers. Since the plaintiffs have a legitimate interest in protecting and nurturing prospective customers visited and not yet sold by their salesman, the territorial limitations must protect all such customers called upon by the defendant employes during the course of their employment. The restriction against employment with companies competing in the assigned territories is unsupported by a legitimate business interest not fully protected by other covenants contained in the employment agreements and will therefore not be enforced.[5]

Our power to tailor the contractual restrictions in order to fashion a fair and effective remedy is well established. Jacobson & Company, Inc. v. National Environment Corp., *supra*, 427 Pa. at 453, 235 A.2d 612; Albee Homes, Inc. v. Caddie Homes, Inc., 417 Pa. 177, 207 A.2d 768 (1965); Barb-Lee Mobile Frame Co. v. Hoot, *supra*, 416 Pa. at 225, 206 A.2d 59.

### B. CONFIDENTIAL CUSTOMER INFORMATION

The customer information used by the plaintiffs' sales force, both given to them upon their taking employment and developed on the job, is confidential information in the nature of trade secrets. Such information is protected by operation of law, Morgan's Home Equipment Corp. v. Martucci, *supra*, 390 Pa. at 623–624, 136 A.2d 838, as well as by the covenants noted above. The customer information here gave the plaintiffs and the individual defendants while in their

---

5. For example, consider the covenant against divulging confidential information.

employ a competitive advantage and was not made up of "general secrets of the trade." Capital Bakers, Inc. v. Townsend, *supra*, 426 Pa. at 192, 231 A.2d 292. The defendants misused this information in furtherance of their unlawful joint effort to violate the covenants of the individual defendants. In this regard the plaintiffs are entitled to an injunction, an accounting and damages to the extent proven, *see infra*.

## C. INTERFERENCE WITH CONTRACT RIGHTS

■ Defendant Malter certainly knew that the individual defendants were subject to restrictive covenants and under such circumstances it was not at liberty to hire them to serve in violation of those covenants. Morgan's Home Equipment Corp. v. Martucci, supra, 390 Pa. at 633, 634, 136 A.2d 838. Nor is a purpose to "cripple and destroy one's competition" a predicate to liability. Jacobson & Company, Inc. v. National Environment Corp., *supra*, 427 Pa. at 455, 235 A.2d 612. The only question here is whether Malter hired the defendants for the purpose of violating their covenants and capitalizing wrongfully on confidential information. See Albee Homes, Inc. v. Caddie Homes, Inc., *supra*. From Rubinson's statements concerning his broad authority to establish a sales force in Pennsylvania; from the fact that Rubinson sent a copy of Certified's commission list to Rodney Davis, Vice President of Malter; from the evidence of Rubinson's enticement of plaintiffs' employes including the other individual defendants; from the acquiescence of Malter in the wrongs of its agents; and from the failure of Malter officials to come forward and rebut reasonable inferences of Malter's guilty knowledge, we conclude that Malter must have hired the individual defendants for the purpose of

committing the wrongs which they have, in fact, committed.

## D. CONSPIRACY

The evidence before us strongly establishes that the individual defendants and Malter conspired to solicit the former accounts of the plaintiffs in violation of the covenants and by means of the unlawful use of confidential customer information. Each individual defendant joined in assisting in the violation of these covenants, knowingly accepting and using information wrongfully divulged in an effort to divert and appropriate the trade of the plaintiffs.

## E. DAMAGES [6]

1. *Lost profits on sales made in violation of covenant not to sell former accounts.*

■ The plaintiffs have established that sales made by the individual defendants on behalf of Malter to former customers of the plaintiffs, violation of their covenants, amount to $20,452.85. Plaintiffs seek to recover the value of the profits they would have received on these sales. In support of this claim plaintiffs offered the testimony of Sherwin Shilling, sales manager for Certified in the Eastern United States. Shilling testified that the profit margin on Certified's sales is twenty per cent.

As to any of these sales which were made to former customers of Dyna Systems and Chemsearch, we have no evidence of percentage of profit; Mr. Shilling did not purport to be knowledgeable about the profits of these companies. As to Certified's profits, moreover, Shilling's testimony appears to be based upon hearsay. He admitted that he did not keep the books and records and that he did not personally make computations of net profits. His testimony, therefore, is

---

6. The covenants and portions of covenants which we have found to be unreasonable are unenforceable in equity. Under the law in Pennsylvania, however, as recently articulated in Krauss v. M. L. Claster & Sons, Inc., 434 Pa. 403, 254 A.2d

1 (1969), damages would be recoverable for breaches even of covenants unreasonably broad to the extent that they are actually proven. There has been no such proof here.

incompetent and without probative value. Since there is no other evidence upon which we might base a finding of Certified's potential profits on these sales, this claim for damages must fail. Nevertheless, because of the nature of their conduct the defendants must render an accounting to the plaintiffs for *their* profits from this wrongful conduct: Malter for its profits and the individual defendants for any commissions or overrides they received as a result of these sales.

### 2. *Loss of sales resulting from the loss of defendants as employes.*

Plaintiffs seek to recover loss of sales which resulted from the loss of the individual defendants as employes caused by the tortious conduct of the defendants. The formula urged upon us is to take the net billings of the individual defendants for 1968 and deduct twenty per cent for net profit. One-fourth of this sum represents lost profits for the period between the inception of the conspiracy until the date of the hearing, approximately three months.

Proof of this element of damage is deficient in a number of ways. First, the twenty per cent profit margin is not supported by competent evidence, as discussed above. Secondly, Chemsearch has suffered no actionable injury from the loss of the services of Kress and Griffith, who terminated before and independently of any wrongful conduct. Thirdly, Dyna has failed to offer any proof of the value of the services of Kress and Griffith (employed by it after they left Chemsearch) to it. Dyna is admittedly a new venture and we are in no position to determine the volume of sales these men might have been able to generate on its behalf.

 Fourthly, there is some question as to whether the plaintiffs could recover the loss of prospective sales even had their proof been sufficient of the value of the loss and the suffering of a loss. The individual defendants were employed at will. And while Malter may not with impunity induce the violation of the covenants not to compete (see *supra*), the interference with the at-will employment relationship itself by a competitor is privileged, unless the purpose is to cripple and destroy, Albee Homes, Inc. v. Caddie Homes, Inc., *supra*. The damages recoverable are those which flow from the tort, *i. e.,* the induced breaches of the covenants, and not from the loss of the at-will employes. Birl v. Philadelphia Electric Co., 402 Pa. 297, 300–301, 167 A. 2d 472 (1961).

### 3. *Loss of investment in training salesmen.*

Plaintiffs seek damages in the amount of $9,000 representing the cost of training each of the salesmen who were lost as a result of the wrongs and contractual breaches of the various defendants. We assume, without deciding, that this element of damages is proper for the breach of the covenant not to hire away employes of the covenantees.[7] The plaintiffs have not persuaded us, however, that the sum of $9,000 per salesman represents a meaningful amount of damages in this case.

As to Kress and Griffith, we note that Chemsearch had lost the services of these men long before the conspiracy. It cannot complain of any loss. Dyna Systems, moreover, who hired these men some time after they had left Chemsearch, was not obliged to make any investment in their training, so that it too cannot complain of any loss in this regard. As to Rubinson and Griffith, and Barr and Slawek (non-parties, but men whom Rubinson had hired away in violation of his covenant), all former employes of Certified, we reach the nub of the problem. We do not believe that recovery of the full amount of the cost of training these men is a proper award of damages. Surely as to Rubinson, for example, who worked in its employ for over five years, Certified has enjoyed a substantial return on its investment in training. We

---

7. Plaintiffs made no claim for damages resulting from the need to hire and train replacements.

have no evidence, however, as to the average term of employment with a given company of a door-to-door salesman in the maintenance chemical business. We have, then, no way to amortize the value of the investment in training. On the evidence before us we have no reasonable basis to assess the loss of the investment in training caused by the hiring away of these men.

**4. *Orders wrongfully cancelled and diverted.***

Plaintiff Chemsearch seeks damages of $1,000 representing the twenty per cent profit it would have received on $5,000 worth of orders Rubinson had placed with them and later diverted to Malter. Again, the twenty per cent figure is unsubstantiated by competent evidence. In addition, however, we are unable to discern whether or not this sum is included in the $20,452.85 of sales made by the individual defendants on behalf of Malter to former customers of the plaintiffs. In any case, the plaintiff Chemsearch is entitled to an accounting on this $5,000 figure of Malter's profits and any commissions or overrides earned by Rubinson to the extent that it is not duplicative of the sales represented by the $20,452.85 amount.

**5. *Loss of goodwill and future losses.***

■ Plaintiffs seek also damages for loss of goodwill and future losses. We agree that the recovery of such damages is proper here, especially in view of the conspiracy to commit the intentional tort of interference with covenants that were intended to protect the plaintiffs' goodwill. This is so under any theory of damages: consequential contract damages, damages proximately caused, or damages flowing from an intentional tort. However, the testimony of Shilling, offered on behalf of Certified, is fatal to this claim. Although he indicated that Certified (or all the plaintiffs?) had lost twenty-five per cent of its Pennsylvania sales force, he also said:

"If you go further than that I can't tell you to what extent at this time it is going to do, if we can recapture these customers or not. I hope we can, but there is no way or telling whether we will ever sell them again or how much damages it is doing to us now or what it will cost us in the future.

"*I really have no way of estimating.*" (Emphasis added)

We are in no better position than Mr. Shilling.

**6. *Litigation expenses.***

■ The last item of compensatory damages sought by plaintiffs is recovery of litigation expenses.

"A person who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover compensation for the reasonably necessary loss of time, attorney fees and other expenditures thereby suffered or incurred."

RESTATEMENT OF TORTS, § 914 (1939).

The recovery of litigation expenses as an element of damages in the present case presents a dilemma. There are here in reality two lawsuits. One, to restrain the breach of the covenants, falls squarely within Section 914 of the Restatement of Torts, which is the law of Pennsylvania, Seaboard Surety Co. v. Permacrete Construction Corp., 221 F.2d 366 (C.A. 3, 1955), and which would entitle plaintiffs to litigation expenses. The other, a simple claim against Malter for damages, falls within the rule "that a party to adversary litigation is ordinarily required to pay his own counsel fees, as otherwise 'clients would pay liberally out of the pockets of their adversaries,' Alexander v. Herr's Ex'rs, 1849, 11 Pa. 537, 539; * * *." Blum v. William Goldman Theatres, Inc., 164 F.2d 192, 198 (C.A. 3, 1947).

The suit was brought originally in the form of a motion for a preliminary injunction to enforce the restrictive covenants. The action against Malter *for damages* was not properly before the

court on that motion. It was through the agreement of the parties and the court that the preliminary hearing was treated as a hearing for permanent relief and the issues of damages adjudicated. The basic thrust of the action, then, was to prevent the injuries the plaintiffs were suffering through the solicitation of their accounts, the enticement of the employes, and the misuse of their trade secrets by the defendants. Malter was a part of these illegal activities, of course, through the actions of its agents in a conspiracy to commit contractual breaches and legal wrongs.

Furthermore, in light of the equitable relief available in the action against the individual defendants, Malter could have been restrained from assisting these defendants to breach their covenants once the decree was issued without the necessity of naming it as a respondent. In a very real sense, then, the litigation of the damage claim at this stage was an afterthought, albeit one concurred in by the parties and the court. It is relevant, moreover, that the extent to which the recovery of litigation expenses here indirectly finances the plaintiffs' action against Malter is probably slight. This is so because had the plaintiffs sued Malter for damages in a separate acting, having secured relief against the individual defendants, the issues in the later action may well have been narrowed. In addition, in a separate action for damages punitive damages would be appropriate, see discussion *infra*, and in awarding these damages the court could have recompensed the plaintiffs for litigation expenses, including the cost of bringing the separate actions for damages. See Restatement of Torts § 908, comment e (1939).

As a matter of fact, in light of our discussion above, the net effect, although not the intention, of the damage testimony was merely to demonstrate that plaintiffs indeed have no adequate remedy at law.

We conclude, then, that it is appropriate under these circumstances to award compensatory damages to the plaintiffs for the cost of pursuing their rights against the individual defendants who breached their covenants as the result of the Malter's tortious conduct. We realize that, because the claim for litigation expenses was based upon the record developed in litigation for which costs Malter is liable, the plaintiffs have effected an economic saving. Nevertheless, Malter's liability is not increased thereby. The fact that the plaintiffs did not bring a separate action, moreover, inures to the benefit of both the plaintiffs and Malter.[8]

Plaintiffs produced no evidence of the extent or nature of the legal services rendered. We do know, though, that counsel spent four days in court and we have before us the pleadings, briefs, and requests for findings of fact and conclusions of law. We are therefore in a position to assess the value of those services of which we have actual knowledge and we believe that fair compensation for those services is $5,000. This, of course, does not include time for depositions, conferences or preparation as to which we have no evidence.

### 7. *Punitive Damages.*

 This is a proper case for punitive damages. We agree with the plaintiffs' view that Malter was responsible for Rubinson's conduct and that "the acts of Rubinson in flagrantly inducing breaches of contract, concealing their violations, in destroying and altering subpoenaed documents to conceal these breaches, in altering his appointment book after request to produce it was made and in falsely testifying before this court must

---

8. Plaintiffs do not seek such damages against the individual defendants for their participation in the conspiracy to assist each other and Malter in breaching the covenants. This kind of claim would also fall within the language of Section 914 but because of the even more intimate relation of conspiracy of the individuals with the individual breaches presents a more difficult question than the one with which we are faced.

be regarded as outrageous." Plaintiffs' Supporting Memorandum, 36.

Rubinson's action were those of Malter and punitive damages lie equally against Malter. Malter authorized the actions of Rubinson; Rubinson was employed as sales manager for Malter and was acting in the scope of his employment; and, in view of the fact that the activities of Rubinson and the individual defendants were for Malter a matter of record, Malter can be said to have ratified and approved Rubinson's actions. Restatement of Torts, § 909 (1939).

Punitive damages, under Pennsylvania law, must bear a reasonable relationship to compensatory damages. Suflas v. Cleveland Wrecking Co., 218 F.Supp. 289 (E.D.Pa., 1963). The only compensatory damages we have found are $5,000 in litigation expenses. In light of this and because of the outrageous conduct of Malter and its agents, with a wanton disregard of the plaintiffs' rights, we find Malter liable for $10,000 in punitive damages.

Although Rubinson might otherwise be liable for punitive damages, the failure of proof of compensatory damages against him precludes recovery of such damages. The law in Pennsylvania is that an award of compensatory damages is a prerequisite to the recovery of punitive damages. See, e. g., Weider v. Hoffman, 238 F.Supp. 437 (M.D.Pa., 1965).[9]

### F. EQUITABLE RELIEF

The individual defendants have wrongfully exchanged confidential customer information to such a great extent and have acted in a fashion manifesting such a disregard for the plaintiffs' rights that the former accounts of *each* of them should in equity remain unavailable to *all* of them for the period of the covenants. Because of the extensive exchange of customer information all the defendants will, in addition, be precluded from soliciting and selling any accounts called on by the individual defendants while in the plaintiffs' employ, whether or not the accounts were actually sold. Malter by its involvement in this unlawful activity must account to the plaintiffs for all profits realized as the result of the *wrongs of its agents;* the individual defendants must account for all commissions and overrides received as a result of their wrongful conduct.

The foregoing discussion shall be considered our conclusions of law, in addition to which we conclude specifically that the court has jurisdiction over the parties to and the subject matter of this litigation.

Any statements of fact contained in the "Legal Discussion" not specifically found in the "Findings of Fact" are nevertheless additional findings of fact.

Contentions of the parties not discussed above have been fully considered and rejected.

The parties are directed to agree upon and submit a decree in accordance with the terms of the foregoing Opinion.

---

9. Although Rubinson is required to render an accounting of any commissions and overrides he received as a result of the solicitation of the plaintiffs' business in violation of the covenants, we do not believe that this is the equivalent of the award of compensatory damages necessary before punitive damages may be recovered. Such an accounting depends not upon injury to the plaintiff, but upon profits made by a wrongdoer from his illegal acts.