**C. ALBERT SAUTER COMPANY, INC.**

v.

**RICHARD S. SAUTER COMPANY, INC., et al.**

**Civ. A. No. 72–1451.**

United States District Court, E. D. Pennsylvania.

Oct. 5, 1973.

Revised Oct. 30, 1973.

See also, D.C., 57 F.R.D. 537.

**504**

Irving R. Segal, Bancroft D. Haviland, Sterling H. Schoen, Jr., Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for plaintiff.

Henry W. Sawyer, III, Stewart Dalzell, Drinker, Biddle & Reath, Philadelphia, Pa., appeared only in the Post-trial motions, for defendant.

## MEMORANDUM OPINION AND ORDER

BRODERICK, District Judge.

*Memorandum Opinion*

This matter comes before the Court on a series of post-trial motions after a finding by a jury, in a bifurcated trial, that the defendants conspired, agreed or had an understanding to engage in acts of unfair competition with the intent to injure the plaintiff as a competitor by impairing the plaintiff's ability to compete in interstate commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The jury awarded plaintiff damages in the amount of $400,000, which the Court trebled, in accordance with Section 4 of the Clayton Act, and judgment was entered for the plaintiff on May 15, 1973 in the amount of $1,200,000.

The following motions are now before the Court: (1) defendants' motion for judgment notwithstanding the verdict on the issue of liability, (2) defendants' motion for a new trial on the issue of damages, (3) plaintiff's motion for a permanent injunction, (4) plaintiff's motion for allowance of counsel fees, and (5) defendants' motion for a stay of execution of this Court's money judgment of May 15, 1973 and counsel fees, interest and costs.

The Court will treat the motions separately.

Plaintiff, C. Albert Sauter Company, Inc., is a Pennsylvania corporation engaged in the manufacture and sale of packages, packaging materials and equipment, primarily for use in pharmaceutical contract packaging. Defendant Richard S. Sauter Company, Inc. is a Pennsylvania corporation engaged in the same business as the plaintiff. Defendants Richard S. Sauter, Theodore Seidenberg and John N. Park are residents of the Commonwealth of Pennsylvania.

Plaintiff asserted violations of Section 1 of the Sherman Anti-Trust Act in Counts I and II of the complaint [1] upon which the jurisdiction of this Court is based.

In support of the allegations of violation of the Sherman Act, plaintiff alleged, inter alia, that defendants:

(a) solicited and hired away plaintiff's key personnel for the purpose of injuring plaintiff's business;

(b) solicited and hired away plaintiff's employees for the purpose of acquiring and using plaintiff's confidential information;

(c) appropriated for their own use plaintiff's job orders, bid estimates and specifications;

(d) intentionally confused customers, suppliers and the general public by the use of a deceptively similar corporate name;

(e) falsely advised plaintiff's personnel that plaintiff would go out of business in order to frighten those em-

---

1. Counts III–VII were based upon pendant state court claims arising out of the same occurrences upon which Counts I and II were premised. The pendant claims were withdrawn after the jury found for the plaintiff on the antitrust issues. Count VIII was withdrawn by plaintiff before trial.

ployees into leaving plaintiff's employ; and

(f) subverted plaintiff's employees to act in violation of their fiduciary duties to plaintiff.

After a sixteen-day trial of the liability issue, on May 2, 1973, the jury answered "yes" to the following interrogatory:

Do you find that any of the defendants conspired, agreed or had an understanding to engage in acts of unfair competition with the intent to injure the plaintiff as a competitor by impairing plaintiff's ability to compete in interstate commerce?

And after two days of testimony on the issue of damages, the jury awarded plaintiff $400,000 before trebling.

Taking all of the evidence in the light most favorable to plaintiff for the purpose of considering these motions, there was an abundance of evidence to support the jury's verdict.

Prior to January 1969, defendant, Richard Sauter, was the president and controlling shareholder of plaintiff; defendant, John Park, was a salesman for plaintiff. In January 1969, a plan of reorganization was executed by the shareholders of plaintiff and The Lehigh Press, Inc., whereby plaintiff became a wholly-owned subsidiary of Lehigh. Richard Sauter remained as president of plaintiff. In August 1969, Lehigh acquired the outstanding stock of the Sparks Corporation, which was also engaged in some phases of pharmaceutical packaging. After this acquisition, Richard Sauter became the executive vice president of Lehigh in charge of its packaging division; and, upon Richard Sauter's recommendation, John Park was named president of the plaintiff.

Plaintiff presented evidence that as early as July 9, 1971 defendants Richard Sauter and John Park began to conspire to leave plaintiff, to open a competing business and to eliminate plaintiff as a competitor by pirating its key employees. To this end, Richard Sauter, without prior notice to plaintiff, and contrary to prior indications to plaintiff's personnel and the president of Lehigh, submitted his resignation on October 22, 1971, effective in one week—October 29, 1971. John Park did not then leave but remained as president of plaintiff. At some time prior to Sauter's leaving plaintiff on October 29, 1971, defendant Theodore Seidenberg joined the conspiracy. One month later, on November 29, 1971, Richard Sauter and Theodore Seidenberg incorporated the defendant, Richard S. Sauter Co., Inc., a company that was to be directly and completely competitive with plaintiff. Richard Sauter and Theodore Seidenberg became officers and principal shareholders of the corporation.

There was evidence that in late September or early October 1971 Richard Sauter, while still in plaintiff's employ, solicited Philip Spector, production coordinator of plaintiff's four suburban plants, Daniel Gerner, production coordinator, and Matthew Nichols, vice president—engineering, to join Sauter in the new competitive business he was planning. Once preliminary plans were completed and the formation of Richard S. Sauter Co. was announced, Richard Sauter, Seidenberg and Gerner intensified their efforts to hire away plaintiff's key management, supervisory, production and sales personnel. These employees included plaintiff's vice president—sales, quality control managers, plant managers, estimators, customer service representatives, salesmen, commission brokers and skilled machine operators. By offering higher salaries and making statements that plaintiff was about to go out of business, defendants were able to hire away from plaintiff more than 30 key employees. These employees were individually of varying degrees of importance to plaintiff, but the cumulative effect of such a large number leaving within a relatively short period of time did great damage to plaintiff.

Richard Sauter admitted that the defendants contemplated obtaining a substantial number of their key personnel

from plaintiff, that no effort was made to obtain personnel from employment agencies or competitors, and that they knew that this wholesale pirating of employees would injure plaintiff.

There was evidence that as a result of the loss of key personnel plaintiff suffered an immediate and drastic reduction in sales caused by the defendants' solicitation of plaintiff's customers by former employees and plaintiff's own inability to service its remaining customers due to the loss of personnel to defendants. There was sufficient evidence from which the jury could find that the defendants solicited, hired or frightened away plaintiff's key employees for the purpose of eliminating plaintiff as a competitor.

Defendants admitted selecting the name Richard S. Sauter Co. as the name of the corporate defendant in order to capitalize upon the goodwill attached to the name "Sauter" in the packaging industry. This goodwill, of course, was earned by plaintiff's business activity over the years. There was also evidence that in an effort to further confuse customers and suppliers, Richard Sauter instructed defendants' employees to refer to their company as the "Sauter Company", a name by which plaintiff was known in the industry. There was extensive testimony concerning the confusion caused by the similarity of names and, in at least one instance, plaintiff lost an opportunity to submit a bid because the "Sauter Company" had already submitted a bid. But the "Sauter Company" which had submitted the bid was the defendant company, not the plaintiff. There was sufficient evidence from which the jury could conclude that the defendants unfairly appropriated plaintiff's corporate name for the purpose of injuring plaintiff.

Defendants own witnesses admitted copying about 125 to 150 of plaintiff's job orders before leaving plaintiff's employ and subsequently using those documents to prepare bids competitive with plaintiff. Richard Sauter took copies of plaintiff's budgets, sales forecasts and other similar documents showing each of plaintiff's customers and the work being done for each of them. John Park admitted passing on to defendants' estimator copies of estimates taken from plaintiff by Frederick Kraus, plaintiff's former vice president—sales, when he left C. Albert Sauter Co. to join defendants. These estimates were used by defendants to bid against plaintiff. The defendants' own admissions supplied substantial evidence of the misappropriation and use of plaintiff's confidential documents for the purpose of gaining an unfair competitive advantage and injuring plaintiff.

Plaintiff produced direct evidence of defendants' intent to eliminate or cripple plaintiff's business. Richard Sauter told George Kline, Esq., counsel for Lehigh, "I will ruin John DePaul [president of Lehigh]" and "I am going to get that glamour boy, I am going to ruin John DePaul." In addition, there was circumstantial evidence to support the jury's finding of the requisite intent. For example, the defendants set out to secure their executive and skilled employees from plaintiff. They solicited over 90% of such employees and obtained over 80% of them from plaintiff. Richard Sauter admitted that the defendants had hired about 30 of plaintiff's employees, that many of them were key employees and that he knew that this would hurt the plaintiff:

Q: If you got, in a relatively short span of time, a significant portion of your personnel, and particularly important personnel, from the plaintiff, do you think that that would help the plaintiff?

A. No, sir.

Q: It would hurt the plaintiff, wouldn't it, Mr. Sauter?

A. Yes, sir.

Q: If you got enough of the finest assets [employees] of the plaintiff it could ruin the plaintiff, couldn't it?

A. It could, if there were that many involved.

. . . . . .

Q: If you wanted to ruin your second most important competitor wouldn't it be a good way to hire a substantial number of his important personnel?

A. If I wanted to ruin him, yes.

Q: Do you believe, Mr. Sauter, that your company did hire a substantial number of your production and administrative and sales personnel from the plaintiff?

. . . . . .

A. Yes, we hired them.

(Testimony of Richard Sauter, April 19, 1973, at pages 1161–62)

Thus, the jury was presented with substantial evidence from which it could and did find that the defendants were motivated by a desire to destroy plaintiff's business. The clandestine nature of defendants' approach to plaintiff's employees and defendants' failure to make any real effort to obtain employees elsewhere is further evidence on this point.

Finally, there was substantial evidence from which the jury could and did find that a conspiracy existed. The agreement or understanding of defendants to obtain a substantial number of plaintiff's employees was admitted, as were the taking and use of plaintiff's confidential information. Further, there was extensive additional evidence of the conspiracy, both direct and circumstantial. As but one example, Arnold Kleinfeld, one of plaintiff's most important former customers, testified that he told Richard Sauter after he left plaintiff that he, Kleinfeld, could do no work for the defendants so long as he remained plaintiff's commission broker. Immediately thereafter, John Park, who was still president of plaintiff, fired Arnold Kleinfeld, and Mr. Kleinfeld promptly went over to the defendant, Richard S. Sauter Co., gave it all or most of the business he had previously given plaintiff, and was one of defendant's largest customers. Shortly thereafter, John Park resigned his position with plaintiff and himself joined the defendants.

There is a preponderance of evidence in this record upon which the jury could base its finding of an antitrust violation by defendants. Starting with the stated intention to ruin John DePaul, the testimony, when viewed in a light most favorable to the plaintiff, supports the jury's finding of an intent to injure the plaintiff as a competitor by impairing plaintiff's ability to compete in interstate commerce.

The evidence presented by the plaintiff was such that the jury could find that the defendants engaged in a clandestine plan to obtain all of the plaintiff's key employees. There is evidence of five separate solicitations of Mr. Spector, and in the case of some employees, all of the defendants were involved in the solicitation of one individual. The result was almost a complete exodus of plaintiff's key employees.

There was evidence from which the jury could find that the defendants adopted a confusingly similar name and compounded the confusion by stressing the name "Sauter", copied plaintiff's job orders and related documents and used these documents to try to take business away from plaintiff, and almost completely relied on plaintiff's customers as a source of business. Each of these items constitutes unfair competition, and there was ample evidence from which the jury could find that each was done pursuant to an agreement, combination, or understanding among the defendants with the intent to injure plaintiff. In the aggregate, these acts clearly warrant the jury's finding of a violation of Section 1 of the Sherman Act.

There was substantial testimony concerning both the fact of damage and the amount of damage to the plaintiff, C. Albert Sauter Co. Plaintiff's witnesses testified that the solicitation, hiring and frightening away of its employees by defendants produced crippling production problems, which in part were responsible for a loss of customers; required plain-

tiff to pay uneconomically higher salaries in an effort to retain personnel; forced plaintiff to pay large sums of money to employment agencies for replacements for pirated personnel; and required plaintiff to spend a great amount of time and money training replacement personnel. There was unrebutted testimony that the chaotic conditions in plaintiff's plants were caused by defendants' unlawful acts, that these conditions caused some of plaintiff's customers to seek other sources of packaging and that this aided the defendants in their solicitation of plaintiff's remaining customers.

There was testimony that the defendants solicited plaintiff's customers by using plaintiff's former employees and succeeded in taking large amounts of business from plaintiff. During the first nine months of its operations, Richard S. Sauter Co. had gross sales of $1,232,000, and 94 percent of these sales were traced to plaintiff's former customers. During the same period, plaintiff lost sales of $1,211,000 from these same customers. The defendants failed to introduce any evidence whatever to rebut plaintiff's testimony concerning the amount of damage and did not call a single witness during the damage phase of this bifurcated trial. Plaintiff offered evidence which showed its actual damages to be in excess of $750,000, and there was a preponderance of evidence to support a verdict of $400,000.

## I. JUDGMENT NOTWITHSTANDING THE VERDICT ON LIABILITY

The defendants have moved the Court for judgment notwithstanding the verdict on the issue of liability only. Their motion is based solely on the issue of whether the facts of this case warrant the application of Section 1 of the Sherman Act. The defendants argue that, absent proof of an adverse effect on the market, the defendants' conduct was not an unreasonable restraint of trade within the purview of Section 1 of the Sherman Act, 15 U.S.C. § 1. Defendants

rely on Ace Beer Distributors, Inc. v. Kohn, Inc., 318 F.2d 283 (6th Cir. 1963), cert. den. 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166, and Frederick Chusid & Co. v. Marshall Leeman & Co., 326 F.Supp. 1043 (S.D.N.Y.1971). Defendants contend that competition was actually enhanced by the acts of the defendants in the instant case, since where there was $x$ number of competitors before there are now $x$ plus one. Defendants argue that the decisions in Albert Pick-Barth Co. v. Mitchell Woodbury Corp., 57 F.2d 96 (1st Cir. 1932), cert. den. 286 U.S. 552, 52 S.Ct. 503, 76 L.Ed. 1288 (1932); Atlantic Heel Co. v. Allied Heel Co., 284 F.2d 879 (1st Cir. 1960), upon which plaintiff relies, are not applicable to the facts of this case. Finally, the defendants contend that the decision of the Tenth Circuit in Perryton Wholesale, Inc. v. Pioneer Distributing Co. of Kansas, Inc., 353 F.2d 618 (1965), cert. den. 383 U.S. 945, 86 S.Ct. 1202, 16 L.Ed.2d 208 (1966), where facts significantly similar to those in the instant case were found to be a violation of Section 1 of the Sherman Act, is bad law and should not be followed by this Court.

The plaintiff contends that the court should deny the defendants' motion for judgment notwithstanding the verdict because the legal issues set forth in the motion were not raised in the defendants' motion for a directed verdict at the conclusion of the evidence. Plaintiff also claims that the defendants waived the legal issues which they are now raising by their failure to make timely objection to the Court's charge to the jury. Plaintiff also argues that it was not required to prove that the defendants' actions were unreasonable restraints of trade, or that the defendants' actions had an adverse effect on the market in view of the fact that the defendants were guilty of a *per se* violation of Section 1 of the Sherman Act.

### A. WAIVER

On April 19, 1973, following the conclusion of plaintiff's liability case, the

defendants filed and argued a motion for directed verdict listing twenty-three separate grounds concerning failure of proof (N.T. 1324–67). None of the issues now presented were raised in the defendants' original motion for a directed verdict, which motion was denied on April 23, 1973 (N.T. 1372). At the conclusion of all the evidence on liability, defendants renewed their motion for directed verdict "on the ground that taking all the evidence in the light most favorable to the plaintiff they have failed to prove a cause of action under the antitrust allegations of this complaint . . . ." This motion was denied on May 1, 1973. (N.T. 2348). In the entire course of this proceeding to and including the jury verdict on damages the defendants have never challenged the adequacy of plaintiff's complaint or even suggested that the complaint failed to state a cause of action under the antitrust laws. Instead, defendants' counsel contended only that the plaintiff had failed to prove the allegations of its complaint (N.T. 2348–50). In addition, at no time prior to the present motion did the defendants request instructions by the judge in any way raising the legal issues set forth in the present motion.

 A motion for judgment notwithstanding the verdict is, in effect, a renewal of a motion for a directed verdict made at the close of the evidence, and the defendants cannot assert a ground that was not included in that final motion. Lewis v. Mears, 189 F. Supp. 503, 509 (W.D.Pa.1960), aff'd 297 F.2d 101 (3rd Cir.), cert. den. 369 U.S. 873, 82 S.Ct. 1142, 8 L.Ed.2d 276 (1961); Rothenberg v. H. Rothstein & Sons, 9 F.R.D. 211, 212 (E.D.Pa.1949), aff'd 183 F.2d 524 (3rd Cir. 1950). Accordingly, the Court concludes that the defendants have waived all the legal issues raised by their present motion for judgment notwithstanding the verdict.

The only issue in the defendants' motion for judgment notwithstanding the verdict which was raised by the defendants' final motion for directed verdict is the allegation in paragraph six of the motion for judgment n. o. v.—that the evidence adduced fails to establish that the defendants, jointly or severally, conspired to destroy competition. The Court properly ruled that sufficient evidence had been produced by the plaintiff to allow the jury to consider the merits of the case, and the defendants have apparently conceded this issue in their memorandum in support of their present motion for judgment n. o. v.

In paragraphs 9, 10 and 11 of the motion for judgment notwithstanding the verdict, the defendants assert that the Court committed certain errors by misstating the law with respect to unfair competition as a violation of Section 1 of the Sherman Act. The alleged errors are: (1) failing properly to charge the jury as to the facts upon which the jury could base such a finding, (2) charging that restraint of trade need not be unreasonable, and (3) failing to charge that the defendants, in order to be found in violation of the Sherman Act, had to be shown to have conspired with someone other than their corporation or those connected with it.

 Rule 51 of the Federal Rules of Civil Procedure provides:

At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the request. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the court shall instruct the jury after the arguments are completed. *No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection.* Opportunity shall be given to make the objection out of the hearing of the jury.

(Emphasis supplied.)

This rule is mandatory and a party's failure to make timely objection to an instruction bars any review of that instruction on appeal. Porter v. American Export Lines, Inc., 387 F.2d 409 (3rd Cir. 1968); 9 C. Wright & A. Miller, Federal Practice and Procedure, § 2553.

■■ Counsel for defendants never took exception to any of plaintiff's proposed instructions relating to the violation of the Sherman Act which were adopted by the Court, or to the judge's instructions to the jury as to the findings necessary to constitute a violation of the Act. Counsel for the defendants did not object to the Court's supplemental instruction to the jury withdrawing his prior use of the word "unreasonable" and clarifying the rule that restraint need not be unreasonable in a case involving *per se* antitrust conduct, until after the jury had retired to consider its verdict. Even then, his objection was to form not substance (NT. 2580–81). But in any event, the objection was not timely under Rule 51 and may not be raised here. McPherson v. Hoffman, 275 F.2d 466, 471 (6th Cir. 1960). Finally, defendants did not request a charge with respect to intra-corporate conspiracies. In any event, that rule does not apply when, as here, the defendants conspired, prior to the formation of a corporation, to form a corporation for the purpose of injuring the plaintiff. There is substantial evidence from which the jury could conclude that the conspiracy began on or before July 9, 1971, that the defendant corporation was incorporated on November 29, 1971 pursuant to the conspiracy and that from its inception the corporation was a member of the conspiracy.

■ Furthermore, with regard to defendants' contention that interrogatory 1(a) is inadequate to sustain a verdict under Section 1 of the Sherman Act, the record discloses that the defendants agreed with the interrogatory as written and made no objection to it. When special interrogatories are used, Rule 49(a), Federal Rules of Civil Procedure, provides:

. . . The court shall give to the jury such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon such issue. If in so doing the court omits any issue of fact raised by the pleadings or by the evidence, each party waives his right to a trial by jury of the issue so omitted unless before the jury retires he demands its submission to the jury. As to an issue omitted without such demand the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict.

■ Unless a party raises a proper objection to the interrogatory, he waives his right to object at a later date. As stated by Wright & Miller in 9 Federal Practice and Procedure § 2507, 504–05:

These provisions for dealing with omitted issues are a great advance over the common law practice. Before the adoption of the rules it was necessary, in order to support a judgment, that a special verdict contain a finding on every material issue of fact. The Supreme Court went even further, holding that if facts conceded or not disputed were omitted from a special verdict, the court should not assume that a jury trial on the omitted findings had been waived. If such findings were material, the judgment could not stand.

The present rule puts the burden of securing a jury verdict on all the issues clearly on the parties. If jury trial has been waived on an issue by failure to demand submission, the trial judge should make his own finding of fact on that issue. If he does not do so, it will be presumed on appeal that he made whatever finding was necessary in order to support the judgment that he entered.

■ Furthermore, the defendants have waived their defense that plaintiff failed to state a claim upon which relief could be granted. In Smeed v. Carpen-

ter, 274 F.2d 414 (9th Cir. 1960), the defendants asserted in their answer the defense that plaintiff's complaint failed to state a claim upon which relief could be granted, just as defendants here did. But as in the present case, the defendants failed to pursue that defense and, after an adverse decision on the merits, attempted to obtain a new trial on the ground that certain notice requirements under the Packers and Stockyards Act had not been complied with by the plaintiff. It was contended by defendants that their defense of failure of the complaint to state a claim upon which relief could be granted encompassed the notice requirement and that, therefore, the court on appeal could consider the matter. The Court of Appeals concluded that the defendants were obligated to point out to the trial court the manner in which and reason for which the complaint failed to state a cause of action, and that in failing to do so they waived that defense:

> Appellee claims that it did raise the defense by the fourth defense in its answer by the allegation "That the complaint fails to state a claim upon which relief may be granted," which is the language suggested by Form 20 accompanying the Federal Rules of Civil Procedure. The statement of a defense in such general terms suffices where "a single, definite, and certain question" is thereby presented. [Citations omitted.] But here the alleged defect in the complaint was not apparent and the defense should have been supported with sufficient particularity to apprise the court of the defect. [Citations omitted.] *The failure of appellee to bring to the trial court's attention the particulars upon which it relied in its assertion that the complaint failed to state a claim upon which relief could be granted constitutes a waiver of its right to rely on that defense.* 274 F.2d at 418 (Emphasis supplied.)

The defendants in this case never pointed out to this court during the trial on the merits their present contention that the plaintiff's complaint failed to state a claim and, therefore, they have waived this defense. See also Purina Co. v. Parsons Feed and Farm Supply Inc., 364 F.2d 57 (8th Cir. 1966); Stilwell v. Hertz Drivurself Stations, Inc., 174 F.2d 714 (3rd Cir. 1949).

In the memorandum supporting defendants' motion for judgment notwithstanding the verdict defendants' counsel has stated that *"in a sense,* this motion raises a jurisdictional question, since absent a valid Sherman Act cause of action the Court in the present state of the record would lack jurisdiction over the subject matter." Counsel apparently has confused the question of whether the complaint states a cause of action with the question of whether subject matter jurisdiction exists. This Court has jurisdiction to determine the Sherman Act allegations of plaintiff's complaint because they are based upon a federal statute and would thus have jurisdiction to determine whether the facts pleaded constituted a cause of action under the Sherman Act. The United States Supreme Court has, on a number of occasions, clarified the distinction between cause of action and jurisdiction. For example, in Bell v. Hood, 327 U.S. 678, at page 682, 66 S.Ct. 773 at page 776, 90 L.Ed. 939 (1946), the Court, said:

> Jurisdiction, therefore, is not defeated as respondents seem to contend, by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover. For it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction. Whether the complaint states a cause of action on which relief could be granted is a question of law and just as issues of fact it must be decided after and not before the court has assumed jurisdiction over the controversy. If the court does later exercise its jurisdiction to determine that the allegations in the complaint do not state a ground for relief,

then dismissal of the case would be on the merits, not for want of jurisdiction.

See also Montana-Dakota Utilities Co. v. Northwestern Public Service Co., 341 U.S. 246, 71 S.Ct. 692, 95 L.Ed. 912 (1951); Wheeldin v. Wheeler, 373 U.S. 647, 83 S.Ct. 1441, 10 L.Ed.2d 605 (1963).

Even if it is determined that the defendants did not waive the issues raised in their motion for judgment n. o. v., the motion must nevertheless fail on the merits.

## B. UNREASONABLENESS OF THE RESTRAINT

Instances where courts have been called upon to apply Section 1 of the Sherman Act to conspiracies to injure or destroy a competitor in interstate commerce have been rare—only three or four reported cases in almost a century. Only the First and Tenth Circuits have considered the issue, the First Circuit in Atlantic Heel Co. v. Allied Heel Co., 284 F.2d 879, •885 (1960), and Albert Pick-Barth Co. v. Mitchell Woodbury Corp., 57 F.2d 96 (1932), cert. den. 286 U.S. 552, 52 S.Ct. 503, 76 L.Ed. 1288 (1932), aff'g 41 F.2d 148 (1930), and the Tenth Circuit in Perryton Wholesale, Inc. v. Pioneer Distributing Co., 353 F.2d 618 (1965). In Pick-Barth, plaintiff alleged that the defendant, a dominating factor in interstate trade in the United States, conspired with former employees of the plaintiff to deprive plaintiff of its interstate business in kitchen equipment by means of soliciting employees and customers of the plaintiff, and by inducing its employees to take plaintiff's customer lists and records. The defendants demurred, alleging that the complaint did not state a cause of action under the antitrust laws. The trial court sustained the demurrer and dismissed the complaint. The Court of Appeals reversed, finding that the complaint stated a cause of action under the Sherman Act and found that any combination intended to suppress competition in interstate commerce is unreasonable, and, if put into effect, is an unreasonable restraint on trade. A subsequent jury trial ensued wherein the Court submitted to the jury the issue of the reasonableness of the restraint. The jury, answering special interrogatories, found that the defendants conspired to deprive plaintiff of its interstate kitchen business but found that the defendants' acquisition of plaintiff's business did not effect an unreasonable restraint on trade. The trial court entered judgment for the plaintiff, finding that a conspiracy to destroy a competitor in interstate trade was, in effect, a *per se* violation of the Act. The defendant appealed, and the Court of Appeals affirmed, holding that a conspiracy to eliminate a competitor in interstate trade by unfair means is a violation of Section 1 of the Sherman Act, 57 F.2d at 102. The Court stated:

> To constitute an offense under section 1 of the Sherman Act, it is not necessary, if a conspiracy is proven, the purpose and intent of which was to eliminate by unfair means a competitor in interstate trade, to show that the public was affected, and to what extent. Id.

The defendants' argument that *Pick-Barth* is distinguishable because of the defendants admitted market control in that case is without merit. The First Circuit, in *Pick-Barth*, did not restrict its holding of a *per se* violation to the facts in that case, and in our opinion, *Pick-Barth* is good law.

The First Circuit again faced the issue in *Atlantic Heel, supra,* wherein the plaintiff alleged that the defendant conspired to destroy plaintiff's interstate business by enticing away plaintiff's key employees and acquiring plaintiff's trade secrets. The complaint also alleged that pursuant to the conspiracy plaintiff's employees breached the fiduciary duty owed to their employer and that the defendants falsely represented that the defendant was affiliated with the plaintiff to obtain credit. Defendants filed a motion to dismiss for failure of the complaint to state a claim and the district court granted the motion. On

appeal, Judge Hartigan of the First Circuit wrote an opinion reversing the decision of the district court on the basis of *Pick-Barth,* stating that the complaint alleged a conspiracy to destroy a competitor by means so inimical to free and full flow of interstate trade as to constitute a *per se* violation of Section 1 of the Sherman Act. Chief Judge Woodbury stated:

> Judge ALDRICH and I concur in the result but see no occasion at this stage of the case to express wholehearted endorsement of the rule laid down by this court in Albert Pick-Barth Co. v. Mitchell Woodbury Corp., 1 Cir., 1932, 57 F.2d 96, 102. It may be that the case is good law but it was unique on its facts in 1932 and so far as we can determine it stands alone today. At this stage of the instant case there is no need for us to commit ourselves definitely on the *Pick-Barth* rule. 284 F.2d at 884–85.

The defendants argue that the opinion of Judge Hartigan does not support the application of the Sherman Act to the instant case, since in *Atlantic Heel* the plaintiff alleged injury to consumers by way of higher prices and restricted choice. However, Judge Hartigan's opinion follows *Pick-Barth* and does not rely on the alleged public injury to find a *per se* violation. And while the concurring opinion of Chief Judge Woodbury questions *Pick-Barth* as the law in the First Circuit, we repeat that it is good law, as we will point out later on in this opinion.

In the *Perryton* case, a long-time and trusted employee of the plaintiff, the predominant rack jobber in Western Kansas and South Western Colorado, who had full knowledge of plaintiff's operations, routes and customers, left the plaintiff to become sales manager for defendant, *Perryton,* a competitor which had recently moved into the area served by the plaintiff. Before and after leaving, the employee tried to persuade other employees to leave his former employer to come over to the new competitor with as much of their former employer's business as possible. Other employees of the plaintiff participated in the plan, soliciting customers to bring their business to defendant before terminating their employment with plaintiff. The trial court, after a non-jury trial, found that a conspiracy existed to eliminate plaintiff as a competitor in interstate trade by unfair means and held the conspiracy to be a violation of Section 1 of the Sherman Act. The Tenth Circuit affirmed, relying on Atlantic Heel Co., Inc. v. Allied Heel Co., Inc., *supra,* and Albert Pick-Barth Co., Inc. v. Mitchell Woodbury Corp., *supra.* The Tenth Circuit in *Perryton* also determined that a conspiracy to eliminate competition in interstate trade by unfair means was a *per se* violation of the Act. *Id.* 353 F.2d at 621.

The defendants argue that the Sherman Act does not apply to conspiracies, to eliminate competition in interstate trade unless an unreasonable restraint can be shown contrary to *Perryton, Pick-Barth* and *Atlantic Heel.* The defendants further allege that competition was actually enhanced in the instant case, since where there was once $x$ competitors in the industry, there are now $x$ plus one. We have not been persuaded by defendants' arguments, and in our opinion *Perryton, Pick-Barth* and *Atlantic Heel* should be followed in this Circuit.

Section 1 of the Sherman Act, 15 U.S.C. § 1, provides:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . . [15 U.S.C. § 1]

Whenever a plaintiff can prove by a preponderance of the evidence that defendant conspired, agreed or had an understanding to engage in acts of unfair competition with the intent to injure the plaintiff as a competitor by impairing plaintiff's ability to compete in interstate commerce, then defendant has violated Section 1 of the Sherman Act.

Here, plaintiff alleged and proved by a preponderance of the evidence that the defendants conspired, agreed or had an understanding to engage in acts of unfair competition with the intent to injure plaintiff as a competitor by impairing plaintiff's ability to compete in interstate commerce. This was a question of fact for the jury which was resolved in plaintiff's favor.

The Courts have construed Section 1 of the Sherman Act to preclude only those contracts or combinations which "unreasonably" restrain competition. Northern Pacific Railway Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). However, there are several types of conspiracies in restraint of trade which are *per se* unreasonable. *See, e. g.,* United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927); United States v. Socony-Vacuum Oil Co., Inc., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). Conspiracies are *per se* unreasonable when they are accompanied with a specific intent to accomplish a forbidden result. United States v. Columbia Steel Co., 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948). This case falls clearly within the *per se* unreasonable category. The jury found by their answer to interrogatory 1(a) that the defendants "conspired, agreed or had an understanding to engage in acts of unfair competition with the *intent* to injure the plaintiff as a competitor by imparing plaintiff's ability to compete in interstate commerce." In our opinion nothing is more inimical to free competition. See Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). Where a restraint on trade is *per se* unreasonable, it is unnecessary for the Court to charge on the "rule of reason." United States v. Trenton Potteries Co., *supra.* Where the jury finds an intent "to injure the plaintiff as a competitor by impairing plaintiff's ability to compete in interstate commerce" as it did in this case, it can hardly be

argued that the conspiracy is not within the purview of Section 1 of the Sherman Act because the conspiracy was not a complete success, as there are now two companies where there once was one. To hold otherwise would preclude the use of the Act to await the demise of the plaintiff, a result which would clearly be contrary to the intent of Congress.

The decisions relied on by defendants to negate a Section 1 violation are distinguishable. In Ace Beer Distributors, Inc. v. Kohn, Inc., 318 F.2d 283 (6th Cir. 1963), cert. den. 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166, the Court held that the substitution of one distributor for another in a competitive market was not a violation of the Sherman Act. *Ace Beer* is a mere restatement of the law that a refusal to deal is not illegal unless it is the result of a conspiracy. Furthermore, in *Ace Beer* the Court specifically pointed out that its conclusion was not applicable to *"per se"* violations. Similarly, the defendants' reliance on Frederick Chusid & Co. v. Marshall Leeman & Co., 326 F.Supp. 1043 (S.D.N.Y.1971) is misplaced. In *Chusid,* the Court held that a conspiracy to establish a competitor by means of unfair competition was not a violation of the Sherman Act since it found that there was no intent to injure the competitor. *Id.* at 1063. In the instant case, the jury found that there was intent to injure the plaintiff's ability to compete in interstate commerce by means of unfair competition.

The defendants' motion for judgment notwithstanding the verdict on liability is, therefore, denied.

## II. NEW TRIAL ON DAMAGES

The defendants have also moved the Court for a new trial on the issue of damages. The defendants' original motion alleged seventeen errors, but the defendants have restricted the scope of their motion by limiting their brief to three general categories of alleged error. In the first category, the defendants contend that a series of matters cumulatively require a new trial because of the

excessive size of the jury verdict. Counsel for defendants admits that none of these matters alone is a ground for reversal. In the second category, the defendants contend that several rulings of the Court prevented defense counsel from exploring, on cross-examination of Mr. DePaul and Mr. Napoli, the possible loss of sales to the plaintiff if Mr. Richard Sauter had simply retired from the business or commenced a nonconspiratorial competition. In the third category are the Court's rulings that prevented counsel from informing the jury that the verdict would be trebled and the Court's refusal to so instruct the jury.

■ With respect to the alleged cumulative errors in the first category which defendants claim require a new trial, they argue that the 28.14% profit margin claimed by plaintiff was excessive in view of the fact that plaintiff never earned a gross profit of more than 15.8%. Defendants have ignored the fact that Alexander E. Slater, a certified public accountant, testified for plaintiff that 28.14% was the figure to use (N.T. 2818–22, 2825–26, 2832). Mr. Slater stated that his computation was applicable only to corporations operating at a loss, such as plaintiff. He testified that in its loss situation plaintiff would have been able to process additional business with no corresponding increase in overhead, and, consequently, the profit margin on the additional business would be considerably higher than that enjoyed by an enterprise operating profitably at or near capacity. Defendants' counsel cross-examined Mr. Slater extensively on the theory underlying the 28.14% profit figure and was assisted by a certified public accountant retained by the defendants (N.T. 2819). However, defendants chose not to offer any evidence in defense of the damage issue, so that, except for cross-examination, the expert testimony offered by plaintiff stood unchallenged. Clearly, the jury was entitled to give such consideration as it chose to plaintiff's theory in reaching its verdict. Obviously, no one can tell what percentage of profit was used by the jury in rendering a verdict of slightly over one-half the amount of damages which plaintiff claimed before the jury.

■ Defendants next contend that the Court permitted Mr. DePaul to testify, without adequate foundation about sales which the plaintiff lost to competitors other than the Richard S. Sauter Company. Mr. DePaul testified that these sales were lost by plaintiff as a result of the loss of employees and other chaotic conditions caused by the defendants' conduct. This testimony was clearly competent and was not rebutted since the defendants chose to introduce no evidence in defense of the damage portion of the case.

■ It is contended that plaintiff should not have been permitted to select 1970 as a base year because the sales in that year were the highest enjoyed by plaintiff. Plaintiff was privileged to choose any year in its history as a base year, and defendants were free to discredit plaintiff through cross-examination and evidence. It is not the Court's duty or function to substitute its judgment as to whether 1970 was a proper base year. Defendants are concerned because they feel Mr. DePaul's testimony comprised "unsupported generalizations" that 1970 was "more of a normal year" than was 1971 and that such testimony was inadequate. However, they disregard Mr. DePaul's testimony (N.T. 2674–75, 2749–51) to the effect that 1971 was a bad year for pharmaceutical packaging companies because drug companies were attempting to comply with new federal labeling regulations. Mr. DePaul testified that he had been advised by Richard S. Sauter that 1970 was a representative year in the industry (N.T. 2750). This testimony was undenied by the defendants and the plaintiff's evidence was sufficient to go to the jury.

Defendants have placed great reliance on Chief Judge Joseph Lord's decision in Certified Laboratories of Texas, Inc. v. Rubinson, 303 F.Supp. 1014 (E.D.Pa. 1969). In fact, it is the only case cited

by the defendants in support of their motion for new trial on the damage issue. However, the *Rubinson* case is clearly distinguishable on the facts. In *Rubinson,* the 20% profit figure was prepared by an accountant who was not present at the trial and the testimony of plaintiff's witnesses on this subject was held to be hearsay. Here, the accountant who developed the 28.14% profit margin from the records of the plaintiff testified concerning his own computations. There was no hearsay. In *Rubinson,* the plaintiff attempted to recover the cost of training the salesmen who left and was unable to do so because it failed to produce any evidence to support its claim. Here, plaintiff presented the actual cost of training new employees to replace those taken by defendants or who were hired to repair the damage inflicted by the defendants.[2] Finally, in *Rubinson,* the Court refused to permit plaintiffs to recover certain profits resulting from the general loss of employees. However, Chief Judge Joseph Lord stated that a different result would follow if the defendants' purpose was to "cripple and destroy." 303 F. Supp. at 1026. Here, plaintiff presented evidence that defendants' purpose was to cripple and destroy, and the jury specifically so found. The *Rubinson* decision is of no help to defendants; it only serves to buttress plaintiff's case.

■ The defendants' contend that the Court erred in refusing to permit counsel for the defendants to cross-examine Mr. DePaul and Mr. Napoli as to losses that would have occurred had Mr. Sauter retired from the packaging business or had engaged in a lawful competition. The basis for their contention is a question objected to on cross-examination of Mr. DePaul:

By Defendants' Counsel: Is it your testimony, sir, that Mr. Sauter, with all of the years of experience he had

starting when he left your company, is it your testimony, sir, that he could not have gotten one sale from one customer fairly on the open market from the time up until October 31, 1972?

By Plaintiff's Counsel: I object on the ground of the relevance in view of the jury's finding of liability. *Fairly* is not in this case anymore. (N.T. 2770) (Emphasis supplied.)

Defendants' memorandum supporting their motion for new trial is based upon a generalized statement of this testimony and not the actual question involved. When the question involved is examined, it is seen to be clearly improper. At the time the quoted question was asked, there had already been a jury finding against the defendants on the issue of liability. The jury had found that the defendants had conspired to engage in acts of unfair competition for the purpose of injuring the plaintiff as a competitor in interstate commerce. Thus, the question of "fairness," i. e., conduct not pursuant to the conspiracy, was no longer in the case because of the adverse decision on liability. Whether Mr. Sauter could or could not have obtained sales fairly or without the conspiracy of which he was a major participant was no longer open to discussion. The jury had found that he was a conspirator with other principals of the corporate defendant and the manifestation of the conspiracy was the taking of business from the plaintiff by reason of pirated employees, stolen documents, improper use of deceptively similar name, etc.

The Court did not preclude counsel for defendants from inquiring into the reasons for plaintiff's losses but only held that the question as asked was improper in view of the jury finding. In fact, defendants did not attempt to adduce testimony as to plaintiff's alleged mismanagement, lack of financial stability, or other possible causes for plaintiff's loss

---

2. Defendants did not attack this element of plaintiff's damage theory in their motion for new trial. Chief Judge Joseph Lord noted that, unlike the present case, the plaintiff made no claim for damages resulting from the need to hire and train replacements. 303 F.Supp. at 1027 n. 7.

of business other than defendants' conspiracy. They clearly were not precluded from doing so. Most surprising was defendants' failure to introduce *any* evidence as to causation in the damage trial.

The defendants set forth a "proposition" which they believe justifies the question to which this Court sustained an objection. They assume two chains of causation, one legal and the other illegal, operating at the same time. However, that assumption is not supported by the evidence. The evidence is that during the summer of 1971 the defendants began conspiring to injure plaintiff. The damage period involved in this suit is from February 28, 1972 until October 31, 1972, all during the period of the conspiracy. There was no legal chain of events operating.

█ Defendants allege that plaintiff will be unjustly enriched because it did not require Richard S. Sauter to sign a restrictive covenant. Defendants correctly point out that plaintiff was exposed to the risk that Mr. Sauter would leave and compete. However, plaintiff did not assume the risk that Mr. Sauter would leave pursuant to a conspiracy and compete unfairly pursuant to a conspiracy, as the jury in this case has found that he did. Consequently, the only damages found by the jury pursuant to the Court's charge were those which were proximately caused by the conspiracy.

It is argued that this case is analogous to the electrical price fixing cases in which the plaintiff was required to prove as an element of damage the difference between the illegally fixed price and the fair market price absent a conspiracy. The cases are certainly analogous insofar as the plaintiff was required to prove and the jury was instructed to find the damage which was proximately caused by the conspiracy. Defendants' actions pursuant to a conspiracy for the purpose of destroying plaintiff were alleged to be the cause both of defendants' ability to produce

and sell and of plaintiff's inability to produce and sell. Defendants could have introduced evidence, if available, showing other reasons for the plaintiff's inability to produce and sell, but they chose not to do so.

Defendants chose merely to deny the conspiracy and they made no attempt to disprove causation in the damage portion of this bifurcated trial. Defendants did not even try to prove lack of causation through plaintiff's witnesses. All they did was ask a hypothetical question as to what would have happened absent a conspiracy. That kind of speculative question was properly barred. The defendants had the option of competing lawfully or unlawfully; the jury found in the liability portion of the trial that they took the latter road. Thus, the Court properly prevented them from submitting to the jury in the damage portion of the trial what might have happened if they had gone down the lawful road.

█ The defendants' final argument is that the Court erred in failing to permit defendants to tell the jury that the verdict would be trebled and that the Court erred in failing to so instruct the jury. It is the practice in this district to refrain from advising the jury about the trebling of damages. In the Philadelphia Electrical cases, one of the most complex antitrust matters ever tried, the defendants actively sought an instruction relating to trebling of damages. In charging the jury, Chief Judge Joseph S. Lord refused to charge on trebling. This unreported decision by Chief Judge Lord is supported by the reported decision of Judge Allan Grim in Sablosky v. Paramount Film Distributing Corp., 137 F.Supp. 929 (E.D.Pa.1955). The Court having refused to instruct the jury regarding trebling said, in *Sablosky*:

Defendants requested the Court to explain in its charge that if there would be a verdict for plaintiffs the Court would treble it. The Court refused to do this and also refused to permit defendants' counsel to explain

this matter to the jury. Defendants contend these refusals were error on the ground that the jury's lack of knowledge that their verdict would be trebled might have caused them to render a verdict for more than the actual amount of damage in order to impose a penalty on defendants for violation of the antitrust laws.

This contention was well answered in a recent opinion by Judge Holtzoff of the United States District Court for the District of Columbia in Webster Motor Car Co. v. Packard Motor Car Co., 135 F.Supp. 4, 11:

"There was no reason for informing the jury that whatever damages they would award would be trebled, because this is a matter solely for the court. In fact, the jury might have taken such a statement as an intimation to keep the damages at a low level, in view of the fact that the amount allowed by the jury would be multiplied by three. This would have tended to defeat the purpose of the Act of Congress.

"In this connection, it must be noted that it is the practice in this jurisdiction [and also in the Eastern District of Pennsylvania] in civil cases not to give the pleadings to the jury. * * * There may be some reason for imparting the information to the jury in those districts in which it is customary to supply the pleadings to the jury in civil cases, because otherwise the jury on reading the prayer for relief might be confused by the demand for triple damages and might be perplexed by a doubt whether it was its duty to multiply the actual damages by three."

This Court adopts the conclusion and reasoning in the above quotation from Judge Holtzoff. 137 F.Supp. at 941–42.

These decisions have not been reversed and the factors which led Judges Grim and Lord to refuse to permit reference to trebling are still applicable. Despite the existence of some authority to the contrary, (see, e. g., Bordonaro Bros. Theatres, Inc. v. Paramount Pictures, Inc., 203 F.2d 676 (2nd Cir. 1953)), this Court agrees that the jury should not be advised that their award will be trebled.

For these reasons, the Court concludes that the motion for a new trial of the damage issue is denied.

### III. PERMANENT INJUNCTIVE RELIEF

■ After a hearing held by this Court on June 21, 1973, the parties. agreed that some form of permanent injunctive relief is appropriate based on the jury's finding of a conspiracy by Richard S. Sauter, John N. Park, Ted Seidenberg and Richard S. Sauter Co., Inc. to engage in acts of unfair competition with the intent to injure the plaintiff as a competitor by impairing the ability of C. Albert Sauter Company, Inc. to compete in interstate commerce. The parties agreed that such an injunction should include the following:

A. The defendants and each of them are permanently enjoined from:

(1) directly or indirectly soliciting, inviting the hiring of, or hiring, for themselves or on behalf of any other person or entity, employees of the plaintiff;

(2) directly or indirectly making false or misleading representations about plaintiff or its business;

(3) directly or indirectly obtaining or attempting to obtain or divulging or utilizing any confidential information or trade secrets of plaintiff and failing to return those documents and all copies thereof, which previously have been taken by them or for their benefit;

(4) unfairly competing with plaintiff; and

(5) conspiring with one another to do any of the foregoing acts.

B. Defendants, Richard S. Sauter, Theordore H. Seidenberg and Richard S.

Sauter Company, Inc. and each of them are permanently enjoined from:

(1) utilizing the name "Sauter" in connection with the manufacture or sale of packaging and packaging materials. Within ten days of the date of this order, defendants shall send to each of their customers and suppliers a letter advising them that pursuant to Court Order Richard S. Sauter Company is changing its name, and that the company is not, and has never been related to C. Albert Sauter Company, Inc. or Sauter/Sparks, Inc.

The parties are not in agreement, however, as to other provisions of the injunction. The material differences are as follows: The plaintiff has requested the Court to permanently enjoin the defendants from soliciting or accepting any business from the customers which the individual defendants serviced while in plaintiff's employ, and which customers the defendants have wholly taken away from the plaintiff. The plaintiff also maintains that the defendants should be enjoined for a period of three years from soliciting, accepting or processing any repeat business from those accounts which are currently served by both C. Albert Sauter Co., Inc. and Richard S. Sauter Co., Inc. Plaintiff also seeks the Court to require the defendants to fire Fred H. Kraus, John N. Park, as well as other former employees of the plaintiff enticed away into the employ of the defendant. The defendants argue that the nature of the industry is such that orders are placed on the basis of competitive bidding and, therefore, conclude that the market is now freely competitive and that the Court should not place restrictions upon continuing competition between the two companies, with the exception of a six-month bar on the defendants' acceptance of repeat orders from the group of customers which the defendants have wholly taken away from the plaintiff. The defendants also contend that the defendant should not be required to fire John N. Park, Fred Kraus, and other employees solicited from the employ of C.

Albert Sauter Co., Inc. to join Richard S. Sauter Co., Inc.

Appropriate injunctive relief in a Section 1 Sherman Act proceeding should prevent the defendants from enjoying the fruits of their conspiracy. However, the purposes of the Sherman Act would not be served by an injunction which would unduly restrict free competition in the market and unnecessarily deny employees the employment of their choice. Even assuming, for the sake of argument, that the market is currently freely competitive, the defendants have attained their current competitive position by unlawful means. The defendant company is now supplying eighteen accounts which the individual defendants served in various capacities while in plaintiff's employ and which accounts were enticed away from the plaintiff. The Court finds that the defendants should be enjoined from soliciting, accepting, or processing any "repeat" orders from these eighteen customers for a period of two years. With respect to the class of customers currently shared by C. Albert Sauter Co., Inc. and Richard S. Sauter Co., Inc., the Court likewise finds that a two-year injunction against "repeat" orders is appropriate. These remedies will have the effect of preventing the defendants from enjoying the fruits of the conspiracy but will not unnecessarily restrict competition in the market. The Court finds it unnecessary to deprive John N. Park, Fred Kraus and other former key employees of C. Albert Sauter Company of their employment with Richard S. Sauter Company. The terms of the final injunction order are such that the defendants will be denied the fruits of their conspiracy, but competition in the market will not be unduly restricted by the short term limitations on the ability of Richard S. Sauter Co. to compete.

## IV. COUNSEL FEES

Plaintiff, C. Albert Sauter Company, Inc., has petitioned the Court for allowance of counsel fees, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, for

the period from May 22, 1972 up to and including May 10, 1973. While this petition was pending the parties reached an agreement that $250,000 is a reasonable counsel fee. Accordingly, the judgment in this matter of May 15, 1973 for the plaintiff, C. Albert Sauter Co., Inc., and against the defendants, Richard S. Sauter Co., Inc., Richard S. Sauter, Theodore Seidenberg and John N. Park, both jointly and severally, in the amount of One Million Two Hundred Thousand Dollars ($1,200,000.00), together with costs, including a reasonable attorneys' fee to be fixed hereafter, is amended to include a reasonable counsel fee in the amount of $250,000. The total amount of judgment entered for the plaintiff, C. Albert Sauter Co., Inc., and against the defendants, Richard S. Sauter Co., Inc., Richard S. Sauter, Theodore Seidenberg, and John N. Park, both jointly and severally, is One Million Four Hundred Fifty Thousand Dollars ($1,450,000), together with costs.

## V. STAY OF EXECUTION

The defendants have moved for a stay of execution of the money judgment for the plaintiff in the amount of $1,200,000, plus the counsel fee and costs, pending appeal, without posting the usual supersedeas bond. Rule 62(d), Federal Rules of Civil Procedure, provides:

> *Stay Upon Appeal.* When an appeal is taken the appellant by giving a supersedeas bond may obtain a stay subject to the exceptions contained in subdivision (a) of this rule. The bond may be given at or after the time of filing the notice of appeal or of procuring the order allowing the appeal, as the case may be. The stay is effective when the supersedeas bond is approved by the court.

On the basis of uncontradicted financial statements filed in this action, the defendants, severally and jointly, are without sufficient assets to satisfy the judgment and are unable to obtain a bond in the amount of the verdict plus counsel fee and costs. Execution of the judgment would place Richard S. Sauter Company, Inc. and each of the individual defendants in insolvency.

With the adoption of the Federal Rules of Appellate Procedure, effective July 1, 1968, Rule 73(d) of the Federal Rules of Civil Procedure, which referred to supersedeas bonds on appeal, was repealed. Rule 73(d) provided, *inter alia*:

> the amount of the bond shall be fixed at such sum as will cover the whole amount of the judgment remaining unsatisfied, costs on the appeal, interest, and damges for delay, *unless the court after notice and hearing and for good cause shown fixes a different amount* (emphasis added).

The italicized portion of Repealed Rule 73(d) quoted above covered the situations where large money judgments were entered and the defendants were unable to give a supersedeas bond to stay the execution of the judgment, and permitted the Court to issue a stay to prevent irreparable injury. Since the repeal of Rule 73(d), the Courts have been held to have the power in extraordinary circumstances to provide for the form and amount of security for a stay pending appeal, Trans World Airlines, Inc. v. Hughes, 314 F.Supp. 94, 96 (S.D.N.Y. 1970). In addition to the irreparable injury that the individual defendants will suffer should the plaintiffs execute on the judgment, execution is most likely to terminate Richard S. Sauter Co., Inc. as a going concern and eliminate it as a competitor in interstate commerce. The Court concludes, therefore, that a stay of execution is appropriate under the circumstances of this case, with the following conditions, which the Court finds will adequately preserve the assets of the defendants for execution, should the plaintiff prevail on appeal:

### Conditions for Stay of Execution

A. The following security shall be placed in escrow subject to a security agreement to be approved by the Court:

(1) *Richard S. Sauter Company, Inc.*: all of the outstanding stock of Richard S. Sauter Company, Inc.

(2) *Richard S. Sauter*: 36,956 shares (common) of The Lehigh Press, Inc.; 1890 shares (preferred) of The Lehigh Press, Inc., plus the accrued dividends on the preferred stock ($21,262.50); all of his equity in the following securities pledged as collateral for a loan in the amount of $25,000 from Central Penn National Bank:

100 shares of Pennsylvania Power & Light Co.

$15,000 Exxon Corp. 6% debt (11/1/97).

$20,000 New England Tel. & Tel. Co., 6⅜ debt (9/1/2008)

$15,000 American Can Co. 6% debt (7/15/97).

(3) *John N. Park*: 585 shares (common) of The Lehigh Press, Inc.; 30 shares (preferred) of The Lehigh Press, Inc., plus the accrued dividends on the preferred stock ($337.50).

(4) *Theodore Seidenberg*: 100 shares Frankford Transparent Box Co.; $55,902.94 in cash; all monies that are to be paid or due Theodore Seidenberg by Frankford Paper Box Co., McLean Packaging Co., Frankford Transparent Box Co., or Hope, Inc., except salary due; and the $31,579.06 which Theodore Seidenberg paid to Mrs. Helen Morrison, without waiver of any claim which she may assert thereto.

(5) All dividends and interest on the escrowed security.

B. In addition, Richard S. Sauter, John N. Park and Theodore Seidenberg shall jointly file a bond with approved corporate surety or post cash security in the amount of $100,000.

C. The defendants shall comply with each of the following conditions:

(1) Defendants will do everything in their power to maintain the value of all their assets and prevent a decrease in the value thereof.

(2) Defendants shall not pay any notes, debts, or other obligations to one another, Joseph Fenkel, or any of the corporations identified in paragraph A–(4) above with the exception of the existing debt of Richard S. Sauter Co., Inc. to McLean Packaging and with the exception of salary at the present level which may become due to any defendant.

(3) Defendants shall make no financial commitments or expenditures for capital improvements or additions in connection with Richard S. Sauter Co., Inc. without court approval.

(4) Defendants shall not pay any debts in whole or part except to trade creditors in the ordinary course of business and debt obligations as set forth on the financial statements heretofore furnished plaintiff.

D. Plaintiff shall have the right to select an independent auditor to inspect any and all records of the corporate defendant in order to ascertain whether the defendants are complying with provisions of this Order and shall receive monthly profit and loss statements and balance sheets from the corporate defendant within two weeks following the end of each month during the effective period of this Order.

E. In the event of changed circumstances which substantially reduce the value of the security placed in escrow by defendants, the plaintiff has the right to request the Court to increase the security which must be escrowed or, in the event that additional security is not available, to dissolve the stay of execution of judgment.

F. All of the foregoing limitations and escrow arrangements will terminate with the filing of the decision of the Court of Appeals.

This Memorandum Opinion and Order shall constitute the Court's findings of fact and conclusions of law, pursuant to Rule 52(a), Federal Rules of Civil Procedure.

Accordingly, the following Order is entered:

### ORDER

And now, this 5th day of October 1973, it is ordered as follows:

1. The defendants' motion for judgment notwithstanding the verdict on the issue of liability is denied.

2. The defendants' motion for a new trial on the issue of damages is denied.

3. The plaintiff's motion for a permanent injunction is granted and it is hereby ordered:

A. The defendants and each of them are permanently enjoined from:

(1) directly or indirectly soliciting or inviting the hiring of, or hiring, for themselves or on behalf of any other person or entity, employees of the plaintiff;

(2) directly or indirectly making false or misleading representations about plaintiff or its business;

(3) directly or indirectly obtaining or attempting to obtain or divulging or utilizing any confidential information or trade secrets of plaintiff and failing to return those documents and all copies thereof which previously have been taken by them or for their benefit;

(4) unfairly competing with plaintiff; and

(5) conspiring with one another to do any of the foregoing acts.

B. The defendants and each of them are enjoined from:

(1) directly or indirectly, or for themselves or one another or any person or entity, soliciting or accepting, for a period of two years, any repeat orders from the customers identified in Paragraph 2 of Defendants' Exhibit A, introduced at the hearing on June 21, 1973, to wit:

Burton Parsons & Co., Inc.
Elkins-Sinn, Inc.
Carnrick Laboratories
Frank J. Corbett, Inc.
The Franklin Mint
Hausser Scientific
International Pharmaceutical Corp.
Mennen Company
New Item Sampling Service
Packaging Dimensions, Inc.
William H. Rorer
Sandoz-Warner, Inc.
Stewart Paul Company
Unicef Greeting Card Fund
Leeming Pacquin Co.
Dermik Laboratories

Schick, Inc.
Winthrop Laboratories

The defendants are permitted to fulfill any existing contractual commitments.

As used in this injunction, the term "repeat business" shall refer to all business which is based in whole or in substantial part upon:

(a) the unit price, specifications or design of any prior purchase order;

(b) any modification of any prior purchase order as to quantity.

A purchase order may be either written or oral. In order to constitute repeat business, the business need not be identical to the prior business, and it is sufficient if the articles purchased are substantially similar to those previously purchased and a prior purchase order was the principal factor in obtaining the business. Among the factors which shall be deemed to be persuasive indicia of repeat business are:

(i) similarity of products for which packaging is made; or

(ii) similarity of package specifications; or

(iii) absence of requirement to submit a sample package.

(2) directly or indirectly, or for themsleves or one another or any other person or entity, soliciting or accepting, for a period of two years, any repeat orders (as defined above) from the customers identified in Paragraph 3 of Defendants' Exhibit A, introduced at the hearing on June 21, 1973, to wit:

Ayerst Laboratories
Schering Laboratories
S. S. White Company
U.S.V. Pharmaceutical Corp.
Sudler & Hennessey
Warren Teed Pharmaceuticals
Johnson & Johnson
Merck, Sharp & Dohme
Binney & Smith
Acquarium Pharmaceutical
Ciba-Geigy Pharmaceuticals
Gubelman Charts
Lederle Laboratories

Menley James Laboratories
Carter-Wallace, Inc.
McNeil Laboratories
Pfizer, Inc.
Smith, Kline & French Laboratories
E. R. Squibb & Sons

C. Defendants Richard S. Sauter, Theodore H. Seidenberg and Richard S. Sauter Company, Inc. are permanently enjoined from utilizing the name "Sauter" in connection with the manufacture or sale of packaging or packaging materials. Within ten days of the date of this Order, defendants shall send to each of their customers and suppliers a letter in the following form:

This is to advise you that pursuant to an Order of the United States District Court for the Eastern District of Pennsylvania in C. ALBERT SAUTER COMPANY, INC. v. RICHARD S. SAUTER COMPANY, INC., et al., Civil Action No. 72–1451, we are changing the name of our company from Richard S. Sauter to

This change has been ordered by the Court to make it clear that our company is not, and has never been, related to C. Albert Sauter Company, Inc. or Sauter/Sparks, Inc.

Our address and telephone number remain the same.

D. This Court shall retain jurisdiction of this matter in order to enforce the terms of this injunction.

4. The plaintiff's motion for allowance of counsel fees is GRANTED, and the judgment in this matter of May 15, 1973 for the plaintiff, C. Albert Sauter Co., Inc., and against the defendants, Richard S. Sauter Co., Inc., Richard S. Sauter, Theodore Seidenberg and John N. Park, both jointly and severally, in the amount of One Million Two Hundred Thousand Dollars ($1,200,000), together with costs, including a reasonable attorneys' fee to be fixed hereafter is amended to provide as follows:

Judgment is hereby entered in favor of the plaintiff, C. Albert Sauter Co., Inc., and against the defendants, Richard S. Sauter Co., Inc., Richard S. Sauter, Theodore Seidenberg, and John N. Park, both jointly and severally, in the amount of One Million Four Hundred Fifty Thousand Dollars ($1,450,000), together with costs.

5. The defendants' motion for a stay of execution of this Court's money judgment for the plaintiff in the amount of $1,450,000, together with interest and costs, is granted, subject to the following terms and conditions:

A. The following security shall be placed in escrow subject to a security agreement to be approved by the Court:

(1) *Richard S. Sauter Company, Inc.*: all of the outstanding stock of Richard S. Sauter Company, Inc.

(2) *Richard S. Sauter*: 36,956 shares (common) of The Lehigh Press, Inc.; 1890 shares (preferred) of The Lehigh Press, Inc., plus the accrued dividends on the preferred stock ($21,262.50); all of his equity in the following securities pledged as collateral for a loan in the amount of $25,000 from Central Penn National Bank:

100 shares of Pennsylvania Power & Light Co.

$15,000 Exxon Corp. 6% debt (11/1/97)

$20,000 New England Tel. & Tel. Co., 6⅜% debt (9/1/2008)

$15,000 American Can Co. 6% debt (7/15/97).

(3) *John N. Park*: 585 shares (common) of The Lehigh Press, Inc.; 30 shares (preferred) of The Lehigh Press, Inc., plus the accrued dividends on the preferred stock ($337.50).

(4) *Theodore Seidenberg*: 100 shares Frankford Transparent Box Co.; $55,902.94 in cash; all monies that are to be paid or due Theodore Seidenberg by Frankford Paper Box Co., McLean Packaging Co., Frankford Transparent Box Co., or Hope, Inc., except salary due; and the $31,579.06 which Theodore Seidenberg paid to Mrs. Helen Morrison, without waiver of any claim which she may assert thereto.

(5) All dividends and interest on the escrowed security.

B. In addition, Richard S. Sauter, John N. Park and Theodore Seidenberg shall jointly file a bond with approved corporate surety or post cash security in the amount of $100,000.

C. The defendants shall comply with each of the following conditions:

(1) Defendants will do everything in their power to maintain the value of all their assets and prevent a decrease in the value thereof.

(2) Defendants shall not pay any notes, debts or other obligations to one another, Joseph Fenkel, or any of the corporations identified in paragraph A–(4) above with the exception of the existing debt of Richard S. Sauter Co., Inc. to McLean Packaging and with the exception of salary at the present level which may become due to any defendant.

(3) Defendants shall make no financial commitments or expenditures for capital improvements or additions in connection with Richard S. Sauter Co., Inc. without court approval.

(4) Defendants shall not pay any debts in whole or part except to trade creditors in the ordinary course of business and debt obligations as set forth on the financial statements heretofore furnished plaintiff.

D. Plaintiff shall have the right to select an independent auditor to inspect any and all records of the corporate defendant in order to ascertain whether the defendants are complying with the provisions of this Order and shall receive monthly profit and loss statements and balance sheets from the corporate defendant within two weeks following the end of each month during the effective period of this Order.

E. In the event of changed circumstances which substantially reduce the value of the security placed in escrow by defendants, the plaintiff has the right to request the court to increase the security which must be escrowed or, in the event that additional security is not available, to dissolve the stay of execution of judgment.

F. All of the foregoing limitations and escrow arrangements will terminate with the filing of the decision of the Court of Appeals.